IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 3, 2007 Session

## R.D.S.  v.  STATE OF TENNESSEE

**Appeal by permission from the Court of Appeals, Middle Section
Circuit Court for Williamson County
No. II-CR04274     R.E. Lee Davies, Judge**

No. M2005-00213-SC-R11-JV - Filed February 6, 2008

This appeal arises out of a finding of delinquency following a denial of a motion to suppress incriminating statements and seized evidence. The trial court found that the juvenile defendant was not in custody at the time he made his incriminating statements, thus not triggering <u>Miranda</u> requirements; the Court of Appeals agreed. We affirm that part of the Court of Appeals' holding. However, due to a lack of evidence in the record regarding the law enforcement officer's role as a school resource officer, we remand the case to the trial court for a new trial to determine whether the law enforcement officer was required to have reasonable suspicion or probable cause to search the juvenile defendant's truck.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Affirmed in Part, Reversed in Part and Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which GARY R. WADE, J., and FRANK F. DROWOTA, III, SP.J., joined. JANICE M. HOLDER, J., filed a concurring and dissenting opinion. CORNELIA A. CLARK and WILLIAM C. KOCH, JR., JJ., not participating.

Joseph D. Baugh (on appeal) and Matthew T. Colvard (at trial), Franklin, Tennessee, for the appellant, R.D.S.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Assistant Attorney General (on appeal); and Chris Vernon, Assistant District Attorney (at trial), for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On November 25, 2003, G.N., a student at Williamson County's Page High School, was taken to the office of Vice-Principal Tim Brown because of concerns that he was under the influence of some type of intoxicating substance. Mr. Brown summoned Deputy Sharon Lambert, a school resource officer ("SRO"), to his office. Deputy Lambert is a sworn law enforcement officer for Williamson County.

When Deputy Lambert arrived at Mr. Brown's office, she noticed that G.N. appeared to be "very sleepy or groggy, and his eyes were really bloodshot." She asked him what he had taken, and he responded that he had drunk a quarter of a bottle of Robitussin cough syrup before coming to school. Because school had started several hours earlier, she was skeptical that the effects from cough syrup would last that long. It had been reported that G.N. had skipped some of his morning classes, so Deputy Lambert asked him where he had been. He said that he had been out in the parking lot in a truck belonging to the defendant, R.D.S.

Deputy Lambert decided to search R.D.S.'s truck. She and Mr. Brown found R.D.S. in the school commons area. He did not appear to be under the influence of any intoxicants. Deputy Lambert explained to R.D.S. that she was going to search his truck based on G.N.'s apparent intoxicated condition and statements he made regarding his earlier whereabouts. She requested that R.D.S. accompany her because it was his vehicle.

As Deputy Lambert, Mr. Brown, and R.D.S. walked out to the parking lot together, the deputy asked R.D.S. if there was anything in his vehicle that should not be there. He stated that there was not. She told him that he was responsible for anything that was in the truck and again asked him it there was anything there that should not be. He again answered no and referenced the sign in front of the school that cited the Tennessee Code provision[1] that any vehicle on school property was subject to search.

The truck was unlocked. When Deputy Lambert opened the driver's side door, she immediately found a plastic bag containing green leafy material in a compartment of that door. She held it up and said, "[o]h, except for this marijuana." R.D.S. admitted that it was his. The deputy continued to search the truck and found a glass pipe containing a tarry residue.

While they were walking back to the school building, Deputy Lambert asked R.D.S. where he had been that morning. He stated that he and G.N. had left school at about 9:30 a.m., smoked marijuana from a pipe, went to the bank, and then returned to school about an hour later. Tapes from the video surveillance cameras located in the parking lot confirmed that the two students left around 9:30 a.m. and returned around 10:30 a.m.

---

[1] Tennessee Code Annotated section 49-6-4204(a) (2002) provides "[w]hen individual circumstances in a school dictate it, a principal may order that vehicles parked on school property by students . . . be searched in the principal's presence or in the presence of other members of the principal's staff."

When they arrived back at the school offices, Deputy Lambert transported G.N. to the juvenile detention center while R.D.S. remained at the school pending a special education hearing. After that hearing, Deputy Lambert took R.D.S. to the juvenile detention facility. She filed a petition in juvenile court charging R.D.S. with the delinquent acts of simple possession or casual exchange of marijuana and possession of drug paraphernalia. R.D.S. filed a motion to suppress his incriminating statements on the ground that he was not informed of his Miranda rights prior to "his interrogation by Deputy Lambert and Assistant Principal Tim Brown." He also moved to suppress the evidence seized from the truck as being "fruits of the poisonous tree." The court denied the motion. Following a hearing, the court found R.D.S. delinquent.

R.D.S. appealed to the circuit court, where he renewed his motion to suppress his statements and the seized evidence. The court denied his motion, finding that Miranda warnings were not required because R.D.S. was not in custody at the time he made the incriminating statements. The trial court also held that the statements were voluntary and not in response to any specific questions.

At the final trial, Deputy Lambert testified to the aforementioned sequence of events that occurred on the day R.D.S. was arrested.[2] R.D.S.'s mother testified as to her activities on the morning of the arrest. Her testimony was supplemented by a showing of the surveillance video tapes of that day taken from the parking lot at the high school. She testified that she arrived at the school for a meeting at about 10:30 a.m. and saw several students around her son's truck. They left as soon as she approached, except for G.N., who was inside the truck. She testified that before she opened the door, she saw G.N. reach into the front pocket of his hooded sweatshirt, take something out, and place it under the front seat. She asked him what he was doing, and he said that he was tired and that R.D.S. had given him permission to take a nap in the truck. The mother suggested that the marijuana found in her son's truck was not his, but had been left there by G.N., and that R.D.S. had said it was his in order to protect his friend.

The circuit court found R.D.S. to be delinquent. The court ordered him to serve forty-eight hours of juvenile detention and to remain on probation until the age of nineteen. His driver's license was revoked for one year, with the proviso that he could apply to have it returned in ninety days. R.D.S. filed a timely appeal with the Court of Appeals. The Court of Appeals affirmed the trial court as to the admission of the incriminating statements, finding that R.D.S. was not in custody when he made his statements. The intermediate court disagreed with the trial court's finding that the statements were voluntary and not in response to any interrogation by Deputy Lambert. The Court of Appeals also affirmed the trial court with respect to the admission of the evidence, holding that because the search was conducted by a school resource officer, the reasonable suspicion standard should apply, and Deputy Lambert had reasonable suspicion to search the truck. The Court of Appeals also relied in part on Tennessee Code Annotated section 49-6-4204 which allows a school principal to order the search of a vehicle when he or she has reasonable suspicion to believe that there are either drugs or weapons present.

---

[2] The parties stipulated that R.D.S. had passed all the drug tests conducted at the juvenile court since the original petition and that the leafy substance in the plastic bag was tested and identified as marijuana.

On appeal to this Court, R.D.S. argues that the trial court erred in denying his motion to suppress his incriminating statements because he was in "custody" at the time he was questioned by Deputy Lambert in violation of his right against self-incrimination; and that the court erred in allowing the admission of the marijuana and pipe into evidence because the search was illegal due to a lack of probable cause, which was the appropriate standard to apply to the search by Deputy Lambert.

**Analysis**

This case involves a review of the trial court's findings of fact and conclusions of law in denying a motion to suppress evidence. Issues of whether a defendant was placed in custody and interrogated are primarily issues of fact, and we review these factual determinations by the trial court according to the standard set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Under the Odom standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Odom, 928 S.W.2d at 23; see State v. Damron, 151 S.W.3d 510, 515 (Tenn. 2004); State v. Munn, 56 S.W.3d 486, 493 (Tenn. 2001). Questions surrounding the credibility of witnesses and the "resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23; see Munn, 56 S.W.3d at 493. Notwithstanding this deference to the trial court's findings of fact, our review of a trial court's application of law to the facts is conducted under a de novo standard of review. Damron, 151 S.W.3d at 515; Walton, 41 S.W.3d at 81; State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

*I. Custodial Interrogation*

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." This privilege against self-incrimination applies to state governments through the Fourteenth Amendment. See Malloy v. Hogan, 378 U.S. 1, 6 (1964). Our state constitution contains a similar provision in article I, section 9, which guarantees that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Although "we have traditionally interpreted article I, § 9 to be no broader than the Fifth Amendment," State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997), "the significant difference between these two provisions is that the test of voluntariness for confessions under Article I, section 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992) (citing State v. Smith, 834 S.W.2d 915, 918 (Tenn. 1992)).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court concluded that in the context of "custodial interrogation" certain procedural safeguards are necessary to protect against compulsory self-incrimination. Id. at 444. Specifically, the Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. Part of those safeguards include the now familiar Miranda warnings

informing the suspect that:

> he has the right to remain silent, that anything he says can be used
> against him in a court of law, that he has the right to the presence of
> an attorney, and that if he cannot afford an attorney one will be
> appointed for him prior to any questioning if he so desires.

Id. at 479; see also State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997).

Where the Miranda requirements are implicated, they "must be strictly enforced." Walton, 41 S.W.3d at 82 (quoting State v. Goss, 995 S.W.2d 617, 629 (Tenn. Crim. App. 1998)). However, Miranda warnings do not come into play in every circumstance in which police officers interact with citizens. Id. Instead, the requirements of Miranda are only required "when the defendant is in custody and is subjected to questioning or its functional equivalent." Id.; see also Rhode Island v. Innis, 446 U.S. 291, 300 (1980). "Absent either one of these prerequisites, the requirements of Miranda are not implicated." Walton, 41 S.W.3d at 82.

The Court of Appeals held that the questions asked by Deputy Lambert as well as her statement upon finding the marijuana "constituted interrogation or its functional equivalent." We agree. Interrogation includes not only direct questions, but also "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting Innis, 446 U.S. at 301).

The incriminating statements made by R.D.S. were in response to various statements and questions made by Deputy Lambert. When Deputy Lambert found the bag of marijuana, shortly after R.D.S. had denied the existence of anything in the truck that should not have been there, she said "[o]h, except for this marijuana." Being prompted by that statement, R.D.S. admitted that the marijuana was his. He then admitted to smoking marijuana with G.N. as a direct response to Deputy Lambert's question regarding his whereabouts earlier in the day. Deputy Lambert's questions and statements were clearly intended to elicit an incriminating response from R.D.S., thus bringing those questions and statements under the definition of "interrogation." See Sawyer, 156 S.W.3d at 534.

That said, the fact of questioning does not by itself trigger the requirement for Miranda warnings. The questioning must amount to a "custodial" interrogation. Thus, in this case, the determinative issue is whether R.D.S. was in custody when he was interrogated by Deputy Lambert.

The Miranda Court defined custody as a situation in which the defendant is placed under formal arrest or is "otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. We have expanded this definition to mean "under the totality of the circumstances, [whether] a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 852, 855 (Tenn. 1996). To aid in determining whether a reasonable person would consider himself or herself in custody, we consider a variety of factors, including the following:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855. This test is "objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." Id. at 852, 855; State v. Payne, 149 S.W.3d 20, 32-33 (Tenn. 2004) (affirming Anderson).

R.D.S. argues that he was in custody from the time Deputy Lambert and Mr. Brown approached him and "forced" him to accompany them to his truck. However, the circuit court concluded that "asking the young man to walk out while they searched his vehicle [did] not amount to any kind of custodial arrest."

Deputy Lambert testified that when she and Mr. Brown found R.D.S. prior to searching his truck, she told him about G.N. and that they were "going out to the vehicle to search the vehicle because of his [G.N.'s] condition." She said that she did not "tell him" to accompany them, but rather "advised him" of their discovery of G.N.'s condition and "requested that he go with us since it was his vehicle." She stated that she "felt it was appropriate that he be aware that we were going to be searching his vehicle."

The Court of Appeals looked at the totality of the circumstances, including the language and substance of the deputy's request, the fact that the questioning took place in the parking lot and while walking between the school and the parking lot, and that R.D.S. was not confined to the principal's office or some other room in the school for questioning. The intermediate court upheld the decision of the circuit court and concluded that R.D.S. was not in custody because a reasonable person in his circumstances would not have considered his freedom limited to the degree of a formal arrest.

Because this issue of whether an individual is in custody is a question of fact, and because it was raised in the context of a suppression hearing, we uphold the trial court's findings of fact unless the evidence preponderates otherwise. Odom, 928 S.W.2d at 23. Similarly, questions of credibility of witnesses and resolution of conflicts in evidence are matters entrusted to the trial judge. Id. Given the fact-driven nature of the issue and looking at all the circumstances surrounding the questioning, we cannot say that the evidence preponderates against the circuit court's finding that R.D.S. was not in custody. Therefore, we affirm the decision of the Court of Appeals permitting the admission of R.D.S.'s incriminating statements into evidence.

*II. Evidence Seized*

*A. Fruit of the Poisonous Tree*

First, R.D.S. argues that the evidence seized is inadmissible as tainted under the "fruit of the poisonous tree" doctrine.[3]  Because we hold that R.D.S. was not subjected to a custodial interrogation and that his statements were admissible,  any evidence obtained therefrom would not be tainted as "fruit of the poisonous tree."  Moreover, the marijuana was found not as a result of any statements made by R.D.S., but as a result of the appearance of and statements made by G.N.  None of R.D.S.'s incriminating statements were made until *after* Deputy Lambert found the marijuana. Therefore, there is no taint on the evidence.

*B. Probable Cause v. Reasonable Suspicion*

The issue of whether probable cause or reasonable suspicion should be applied to law enforcement officers conducting a search of a student in a school setting is a matter of first impression in Tennessee.  R.D.S. argues that Deputy Lambert was acting in a "specialized law enforcement capacity," i.e. a "School Resource Officer" ("SRO"), but that her position did not "allow a relaxation of the constitutional requirement of probable cause" to search R.D.S.'s truck. The State counters that the search was reasonable because Deputy Lambert had "probable cause to believe that some measure of criminality was afoot" after her encounter with G.N. and his statements about being in R.D.S.'s truck.

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  This protection is not limited to only searches by law enforcement officers, but also guards against unreasonable searches by civil authorities as well. Elkins v. United States, 364 U.S. 206, 213 (1991); see New Jersey v. T.L.O., 469 U.S. 733, 740 (1985); Burdeau v. McDowell, 256 U.S. 465, 475 (1921).  As the United States Supreme Court observed in Camara v. Mun. Court, 387 U.S. 523, 528 (1967), "[t]he basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials."  The reasonableness of a search centers around "the context within which [it] takes place." T.L.O., 469 U.S. at 740. Reviewing courts should balance "the need to search against the invasion which the search entails[,]" Camara, 387 U.S. 536-37; thereby weighing an individual's legitimate expectations of privacy and personal security on one hand and the "government's need for effective methods to deal with breaches of public order" on the other, T.L.O., 469 U.S. at 740.

Generally, government actors cannot conduct a search unless they possess a judicial warrant that was obtained upon a showing of probable cause to believe a crime had been committed. Peyton

---

[3]  "Evidence which is spawned by or directly derived from an illegal search or illegal interrogation is generally inadmissible against the defendant because of its original taint, though knowledge of facts gained independently of the original and tainted search is admissible." Black's Law Dictionary 670 (6th ed. 1990).

v. New York, 445 U.S. 573, 586 (1980). Therefore, a warrantless search is presumed unreasonable, "unless it falls within one of the narrow and well-delineated exceptions to the warrants requirement."[4] Flippo v. West Virginia, 528 U.S. 11, 13 (1999). Even if one of those exceptions applies and a warrant is not required, a search must still ordinarily "be based on 'probable cause' to believe that a violation of the law has occurred." T.L.O., 469 U.S. at 742; see Almedia-Sanchez v. United States, 413 U.S. 266, 273 (1973); Sibron v. New York, 392 U.S. 40, 62-66 (1968). However, the need for "probable cause" is not the touchstone of the Fourth Amendment. The United States Supreme Court has stated that the "fundamental command of the Fourth Amendment is that searches and seizures be *reasonable*, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.'" T.L.O., 469 U.S. at 742 (quoting Almeida-Sanchez, 413 U.S. at 277 (Powell, J., concurring)) (emphasis added).

Similarly, the Tennessee Constitution mandates "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; . . ." Tenn. Const. Art. I, section 7. We have previously held that Article I, section 7 is "identical to the intent and purpose of the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 423 S.W.2d 860, 867 (Tenn. 1968)). Consequently, federal cases addressing issues of searches and seizures are "particularly persuasive." Downey, 945 S.W.2d at 106.

In T.L.O., *supra*, the United States Supreme Court addressed the constitutionality of searches of students by teachers and school officials. In T.L.O., a school official searched a student's purse and found marijuana and evidence implicating T.L.O. in marijuana dealing. 469 U.S. at 328. T.L.O. sought to suppress the evidence of marijuana dealing, claiming the search was unconstitutional. Id. at 329. The Court upheld the search, holding that the standard of reasonableness applied to a search of a student by a teacher or other school official. Id. at 341.

The Court began its analysis by holding that the Fourth Amendment to the United States Constitution applies to searches of students conducted by public school officials. T.L.O., 469 U.S. at 333-37. The Court emphasized that the State has a substantial interest in maintaining a proper educational environment for the school children entrusted to its custody and tutelage. Id. at 337. In balancing the competing interests of a school's need to maintain a proper educational environment and the student's legitimate expectations of privacy, the Court held that teachers and school officials do not need a warrant before searching a student and need not adhere to the requirement that searches be based on probable cause. Id. at 341. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." Id. As with any search, the action must be "'justified at its inception,'" and the search as actually conducted must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'"

_____

[4] There are several narrowly defined exceptions to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). The main exceptions to the requirement for a search warrant are: (1) consent to search; (2) a search incident to a lawful arrest; (3) probable cause to search with exigent circumstances; (4) in hot pursuit; (5) a stop and frisk situation; and (6) plain view. See State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996).

Id. (quoting Terry, 392 U.S. at 20). In holding that the standard of reasonableness applied to a search of a student by a school official, the Court in T.L.O. was careful to point out that it was only addressing searches conducted "by school authorities acting alone and on their own authority" and that they offered no opinion on the "the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies." Id. at 341 n.7.

Since T.L.O. was decided, there has been an increasing presence of law enforcement officers in public schools through a variety of programs and arrangements aimed at combating crime and providing students with a safe and secure learning environment. Michael Pinard, From the Classroom to the Courtroom: Reassessing Fourth Amendment Standards in Public School Searches Involving Law Enforcement Authorities, 45 Ariz. L. Rev. 1067, 1067-68 (2003) ("Pinard"); see generally Jacqueline A. Stefkovich & Judith A. Miller, Law Enforcement Officers in Public Schools: Student Citizens in Safe Havens?, 1999 BYU Educ. & L. J. 25, 31-32 (1999). Many local governments have elected to blend the traditional duties of school officials and law enforcement officers in an effort to protect students and teachers. One such program is the national School Resource Officer program,[5] which places law enforcement officers in schools to perform traditional law enforcement duties in addition to teaching law enforcement-related classes and counseling students "based on the expertise of a law enforcement officer." J.W. ex rel. Watts v. Maury County, No. M2001-02768-COA-R3-CV, 2003 WL 1018138, at *2 (Tenn. Ct. App. Mar. 11, 2003); see Pinard, 45 Ariz. L. Rev. at 1068; see also Ferrell v. Gwinnett County Bd. of Educ., 481 F. Supp. 2d 1338, 1340-42 (N.D. Ga. 2007) (providing an in-depth discussion of the role of an SRO). Other programs place law enforcement officers in schools "through liaison programs between public schools and local police departments," or "outside of physically placing officers in schools, some . . . school districts have forged interdependent relationships between school officials and local police departments." Pinard, 45 Ariz. L. Rev. at 1068.

Increasingly, SROs and other law enforcement officers are becoming more involved in searches on school premises. The majority of jurisdictions which have faced the issue of what standard to apply to SROs or law enforcement officers assigned to schools have applied the reasonable suspicion standard. See, e.g., People v. Dilworth, 661 N.E.2d 310, 317 (Ill. 1996) (holding that reasonable suspicion applies to liaison officer searching on own initiative); Commonwealth v. J.B., 719 A.2d 1058, 1062 (Pa. Super. Ct. 1998) (holding that searches of public school students conducted by school police officers are subject to reasonable suspicion standard); Russell v. State, 74 S.W.3d 887, 891 (Tex. App. 2002) (applying reasonableness standard to officer

---

[5] According to the United States Department of Justice, its Office of Community Oriented Policing Services (COPS) "has played an instrumental role in supplying more than 2,300 law enforcement agencies with over 4,900 School Resource Officers through its popular COPS in Schools (CIS) program." The CIS program "provides an incentive for law enforcement agencies to build collaborative partnerships with the school community and to use community policing to combat school violence." Ensuring School Safety, http://www.cops.usdoj.gov/Default.asp?Item=106. A school resource officer "serve[s] in a variety of roles, including law enforcement officer, law-related educator, problem-solver, and community liaison." U.S. Dept. of Justice, COPS Fact Sheet (2005), http://www.cops.usdoj.gov/files/ric/Publications/e09042494.pdf.

assigned to school); In re Angelia D.B., 564 N.W.2d 682, 690 (Wis. 1997) (holding that the reasonable grounds standard applied to search conducted by officer at request of and in conjunction with school officials).  But see A.J.M. v. State, 617 So. 2d 1137, 1138 (Fla. Dist. Ct. App. 1993) (holding that a school resource officer employed by sheriff's office must have probable cause to search); Patman v. State, 537 S.E.2d 118, 120 (Ga. Ct. App. 2000) (holding that a police officer working special duty at a high school must have probable cause).

These courts have considered such facts as whether the law enforcement officer was in uniform, had an office on the school's campus, and how long each day the officer remained at the school.  See T.S. v. State, 836 N.E.2d 362, 369 (Ind. App. 2007); In re William V., 4 Cal. Rptr. 3d 695, 697 (Cal. Ct. App. 2003).  The Indiana Supreme Court in Dilworth relied in part upon a school handbook that delineated the duties of the school liaison officer.  661 N.E.2d at 320.  Additionally, the Florida District Court of Appeals cited a Florida statute outlining the duties of law enforcement officers assigned to the schools.  See State v. N.G.B., 806 So. 2d 567, 568 (Fla. Dist. Ct. App. 2002) (citing Fla. Stat. § 1006.12 (2001) replaced by Fla. Stat. § 1006.12 (2003)).  Another important consideration is whether the law enforcement officer is employed by the school system or an independent law enforcement agency.  See T.S., 836 N.E.2d at 369 (noting that the school liaison officer was employed by the Indianapolis Public School Police); State v. D.S., 685 So. 2d 41, 43 (Fla. Dist. Ct. App. 1996) (noting that the law enforcement officer conducting the challenged search was employed by the local school system and not by an independent municipal or county law enforcement agency).

In contrast, where law enforcement officers, not associated with the school system, initiate a search, or where school officials act at the behest of law enforcement agencies, the probable cause standard is generally applied.  See, e.g., F.P. v. State, 528 So. 2d 1253, 1254 (Fla. Dist. Ct. App. 1988) (holding that the "school official exception" to the probable cause requirement does not apply when search is carried out at direction of police); State v. Tywayne H., 933 P.2d 251, 254 (N.M. Ct. App. 1997) (holding that probable cause was required when a search was conducted completely at the discretion of the police officers);  In re Thomas B.D., 486 S.E.2d 498, 499-500 (S.C. Ct. App. 1997) (holding that probable cause was required when police conducted a search in furtherance of law enforcement objective, rather than on behalf of school).

School officials and law enforcement officers play fundamentally different roles in our society.  A school official's basic task is to educate students in a safe environment, whereas a law enforcement officer's primary duty is to detect and deter crime.  Law enforcement officers must generally satisfy the higher probable cause standard in order to conduct a search, because they stand in an adversarial role to citizens and the punishment for violating a criminal statue is more severe than the consequences of violating a school regulation.

In turning to the case at bar, Deputy Lambert initiated and conducted a search of R.D.S.'s truck on the grounds of Page High School.  Mr. Brown accompanied Deputy Lambert to R.D.S.'s

truck and was present during the search, but did not participate.[6]  After balancing the competing interests between R.D.S.'s legitimate expectations of privacy and the State's need for effectively investigating breaches of public order, we hold that the reasonable suspicion standard is the appropriate standard to apply to searches conducted by a law enforcement officer assigned to a school on a regular basis and assigned duties at the school beyond those of a ordinary law enforcement officer such that he or she may be considered a school official as well as a law enforcement officer, whether labeled an "SRO" or not.  However, if a law enforcement officer not associated with the school system searches a student in a school setting, that officer should be held to the probable cause standard.

Here, the record before us is devoid of any factors that could allow us to decide which standard should apply to the search by Deputy Lambert.  We know that Deputy Lambert was a duly sworn deputy sheriff conducting a search on her own initiative. Even though the parties have labeled Deputy Lambert an "SRO," they failed to present any evidence about the duties of an "SRO" at Williamson County's Page High School.  Accordingly, we remand this issue to the trial court for a new trial where the parties will be given the opportunity to develop the record in order for the trial court to determine whether the probable cause or reasonable suspicion standard applies to the search of R.D.S.'s truck.[7]

The trial court should consider any evidence introduced regarding the specific duties of Deputy Lambert, including information about her daily activities, any interactions with students she has, any specialized training she has received, any agreements between the Williamson County Sheriff's Office and Board of Education about the SRO program, any stated policies in regards to the SRO program in Williamson County, which governmental entity pays her salary, who are Deputy Lambert's direct supervisors, what classes she teaches, what topics she lectures, what topics she

---

[6] Generally, Mr. Brown, as a school official, could have conducted the search with only reasonable suspicion. However, the Tennessee General Assembly restricted school officials' abilities to search students and visitors by enacting the "School Security Act of 1981."   See Tenn. Code Ann. § 49-6-4201 to -4218 (2002).  The Act states that "[w]hen individual circumstances dictate it, a *principal* may order that vehicles parked on school property by students . . . be searched in the *principal's* presence or in the presence of other members of the principal's staff."  Tenn. Code Ann. § 49-6-4204(a) (2002) (emphasis added).  There is nothing in the statute to suggest that a vice-principal is cloaked with the same authority as the principal to order a search when the principal is unavailable, and we are unwilling to read such a grant of authority into the statute.  See Lavin v. Jordon, 16 S.W.3d 362, 365 (Tenn. 2000) (stating that our duty is "to ascertain and carry out the legislature's intent without unduly restricting or expanding a statute's coverage beyond its intended scope") (internal citations omitted).

[7] In faulting the majority for addressing the probable cause versus reasonable suspicion issue, the dissent stresses portions of the record which appear to indicate that the sole basis for the trial court's ruling with respect to the motion to suppress was a finding that the search was not the illegal fruit of a Miranda violation.  While we agree that the record is somewhat confusing in that respect, we note that the trial court concluded that the legality of the search turned on whether or not probable cause was present.  Specifically, the trial court found that the statements made by G.N. to Deputy Lambert "probably ought to come in . . . because what is being established here is probable cause to conduct the search of [R.D.S.'s] vehicle based on what they've been told by [G.N.]."  Under such circumstances, and given the importance of this legal issue, a majority of this Court concludes that this is indeed a proper case to resolve the question of whether an SRO should be held to the probable cause or reasonable suspicion standard.

counsels students, and whether she is in a uniform and armed. This is not an exhaustive list of factors for the trial court to take into account, but this evidence would be appropriate for deciding whether to hold Deputy Lambert to either a reasonable suspicion or probable cause standard.

Reviewing courts should apply the reasonable suspicion standard when a law enforcement officer, whose duties more closely align with the duties of a school official, conducts a search of a student in a school setting. Here, the parties conclusively labeled Deputy Lambert an "SRO," but did not provide sufficient facts for the trial court to appropriately label her as a school official or a law enforcement officer. As such, this case is remanded to the trial court for a new trial to determine whether Deputy Lambert should be held to a reasonable suspicion or probable cause standard.

### Conclusion

In sum, we hold that the incriminating statements made by R.D.S. were properly admissible because he was not in custody at the time he made the statements, and therefore no Miranda warnings were required. With respect to the evidence seized, the parties failed to present sufficient evidence for the trial court to conclude whether Deputy Lambert's duties allow her to conduct a search based upon reasonable suspicion or whether the search should be based upon probable cause. Therefore, we remand this case to the trial court so the parties may present more evidence on this issue.

The costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM M. BARKER, CHIEF JUSTICE