IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2024

**TYLER KEITH PARRISH v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Marshall County**
**No. 2020-CR-95      M. Wyatt Burk, Judge**
_____

**No. M2023-01270-CCA-R3-PC**
_____

Petitioner, Tyler Keith Parrish, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JILL BARTEE AYERS, J., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the appellant, Tyler Keith Parrish.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Robert J. Carter, District Attorney General; and Lee Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. FACTS AND PROCEDURAL HISTORY**

**Trial and Direct Appeal**

On direct appeal, this court summarized the facts presented at trial regarding Petitioner's convictions for two counts of aggravated sexual battery:

> [A]t the time of the incident [the victim] was 10 years old. [Petitioner] is [the] victim's father. The victim has four brothers and one sister and is the

second oldest of the children. Four of the children were staying at [Petitioner]'s house in June of 2020.

One night at around 11 p.m., as the victim was trying to fall asleep, she was listening to music on her tablet in her "dad's bedroom." The victim was wearing "[a] Lion King shirt and blue sweatpants[,]" which she described as loose-fitting. One of her little brothers was in the bed with her. Eventually, she fell asleep. She awoke around 2:00 or 3:00 a.m. "to someone reaching for [her] chest." She realized that her younger brother was no longer in the bed and that [Petitioner] was in the bed with her, "reaching" for her "left side." [Petitioner]'s "face was in his pillow" and the victim did not know if [Petitioner] was awake or asleep. [Petitioner's] hand was "on the inside" of her shirt. The victim "froze and acted asleep." After about what seemed like "5 to 10 minutes[,]" [Petitioner] "moved [his hand] around" the victim's stomach. [Petitioner] kept his hand on her stomach for what seemed like about 10 to 15 minutes, and then he moved his hand into her sweatpants and put his hand on her private parts "[w]here [she] pee[s]." [Petitioner's] hand was not moving around. The victim was shocked. [Petitioner] eventually took his hand out of her pants and "tried to put his arm around [her] stomach again." [Petitioner] was still face down on the pillow. The victim got up and ran to the bathroom and "started to cry." When she regained composure, she went to the room where her brothers were sleeping to see if anyone was awake. One of her brothers was awake, but she did not tell him about what happened. She went back to [Petitioner's] room, grabbed her tablet, and went back to her room where she watched YouTube videos and listened to music until she fell asleep. [Petitioner] had not moved from the pillow when the victim retrieved her tablet.

. . . .

On June 10, 2020, the victim "video-chatted" with her mother on Instagram using her tablet at [Petitioner's] house. She appeared "[f]rightened, nervous" and told her mother about what happened to her in her father's bedroom. The victim's mother initially asked if the victim was "just trying to come home." As a result of the conversation, the victim's mother "got in [her] car from [her] house and started to head to Chapel Hill while making phone calls" to the Marshall County Sheriff's Office and the Chapel Hill Police Department. As instructed by police, she stopped at the Chapel Hill Police Department on the way and eventually got to [Petitioner's] house about an "hour and a half to two hours" after she first

heard from the victim. The victim's mother was "[e]nraged, confused" and "held back" by her stop at the police department.

Once she arrived at [Petitioner's] house, the victim's mother picked up all four children. She talked to [Petitioner], who admitted that he was drinking and using marijuana on the night of the incident. He "couldn't recall" any of the events that the victim described to her mother but recalled going to the room and seeing the victim in bed. When the victim's mother and children left [Petitioner's] house, they returned to the police department.

. . . .

[Petitioner] was transported to the police department, "Mirandized," and questioned by Chief Kon of the Chapel Hill Police Department and a sergeant. During the interview, [Petitioner] asked for an attorney. The interview was terminated at that time.

The victim's forensic interview was introduced as an exhibit at trial and played for the jury. During the interview, the victim described the incident consistently with her trial testimony. The victim told Ms. Warden, the forensic interviewer that she fell asleep in [Petitioner's] bedroom in Chapel Hill and woke up and felt someone touching her chest on her left side under her shirt on her skin. She realized it was [Petitioner]. She was scared, and she stayed very still. Next, [Petitioner] touched her "private part" by putting his hand on her body inside her underwear, leaving it there for a few minutes. [Petitioner] next touched her side. The victim was wearing sweatpants and a t-shirt at the time. The victim told Ms. Warden that she eventually got up and went to the bathroom. After she went to the bathroom the victim walked back into the bedroom to retrieve her tablet. The victim did not notice anything change about [Petitioner's] body when he touched her. The victim remembered talking to Ms. Warden on another occasion about a similar incident involving another person.

[Petitioner] chose not to testify at trial. After closing arguments and jury instructions, the jury retired to deliberate. The jury found [Petitioner] guilty of both counts of aggravated sexual battery, as charged in the indictment.

*State v. Parrish*, No. M2021-01452-CCA-R3-CD, 2022 WL 11555309, at *1–2 (Tenn. Crim. App. Oct. 20, 2022), *no perm. app. filed*.

The trial court held a separate sentencing hearing, during which it considered the arguments of the parties and several enhancement and mitigating factors. *Id.* at *4. Regarding Petitioner's mental health, the court applied the catch-all mitigating factor (13) and accounted for Petitioner's "challenges he had growing up" with mental illness but gave the factor "very little weight, if any at all." *Id.* The court merged the two counts of conviction and ordered Petitioner to serve a within-range sentence of twelve years in the Tennessee Department of Correction. *Id.*

On direct appeal, this court affirmed the judgments of the trial court. *Id.* Petitioner subsequently filed a timely petition and amended petition for post-conviction relief.

## Post-Conviction Proceedings

As relevant to this appeal, in his petition for post-conviction relief Petitioner alleged Counsel was ineffective for failing to request a mental health evaluation for Petitioner. According to Petitioner, this evaluation was necessary, asserting that Counsel should "at least have investigated a mental illness defense." Our summary of the post-conviction proceedings is limited to the facts relevant to that issue.

On July 24, 2023, Petitioner's hearing for post-conviction relief was conducted before the post-conviction court. Only two witnesses testified at the hearing—Petitioner and Counsel. According to Petitioner, at the time of the offenses and the time of his arrest, his mental stability was compromised due to his failure to take his medications prescribed for schizophrenia, bipolar disorder, depression, and anxiety. Rather than taking the medications as prescribed by his physician, Petitioner admitted he was attempting to "self-medicate" by using alcohol, marijuana, "and a little methamphetamine." He further indicated that he had been diagnosed with post-traumatic stress disorder. After his arrest, Petitioner admitted he had received treatment and medications to help him control his anger. Petitioner indicated that those attempts were unsuccessful, however, and stated that he was still having outbursts such as "headbutting tables."

Due to the COVID-19 pandemic, the initial meetings between Petitioner and Counsel took place over Zoom videoconferencing. Petitioner admitted that he did not tell Counsel that he was using illicit drugs, and when asked whether he spoke with Counsel about his mental illness, Petitioner responded "no, not really." Petitioner testified that Counsel presented him with two plea offers from the State. The first was eleven years and the second was eight years, with both to be served at 100 percent. Petitioner rejected both offers.

- 4 -

Petitioner testified that he understood that the defense theory at trial would be that he was asleep during the encounter and, therefore, was not guilty. Although Petitioner stated that Counsel did not discuss the "pros and cons" of Petitioner testifying, when asked, "Who made the decision that you would or would not testify," Petitioner responded that he and Counsel made that decision. Counsel advised him that testifying was not in his best interest and, although Petitioner later stated he wanted to testify at trial, he said that he ultimately decided against it because his anxiety was high, and he did not want "to muddy the jury or anything."

At the time of trial and the post-conviction hearing, Counsel was an assistant public defender in the 17th District Public Defender's Office and practiced in "every court [his office was] assigned to from juvenile through circuit court and appeals." A second attorney with his office ("Co-counsel")[1] assisted Counsel with Petitioner's defense. When Counsel was appointed to Petitioner's case, Counsel testified that he obtained discovery, including a video of the victim's forensic interview, to prepare for trial. Counsel reviewed the video and an audio recording the victim's mother had made of a conversation between her and Petitioner. Counsel said the audio recording gave him an idea what the victim's mother "was thinking." He also sent an investigator from his office to meet with Petitioner to discuss the evidence collected in the case and to interview Petitioner to obtain "his side of the story." Prior to trial, Counsel filed three motions in limine—one to exclude any allegation that Petitioner had engaged in similar behavior with his other children; the second to exclude a recorded statement in which Petitioner told the victim's mother that "he may be a pedophile"; and the third to exclude evidence of sexual activity between Petitioner's children. Counsel was successful on all three motions.

Counsel testified that, before trial, he was aware of Petitioner's diagnoses of some mental conditions and that Petitioner "was medicated." Counsel continued:

> However, [Petitioner's] statement from the beginning was that he didn't do this. And so he could talk to us clearly about his case, so we saw no need for an evaluation of competency. And if he just didn't do it, then there was not a reason to ask for an evaluation regarding [an] insanity defense or even really diminished capacity because those arguments would have still been . . . he did it but because of his mental health he either couldn't form the requisite mens rea or couldn't appreciate the wrongfulness of his actions.

When Counsel was asked whether he had ever filed a motion for his clients to receive mental evaluations in his experience as a public defender, he responded, "Many

---

[1] Co-counsel did not testify at the post-conviction hearing.

times." However, nothing in any of his conversations with Petitioner caused him to think that Petitioner needed one. Regarding Petitioner's testimony that he was "headbutting tables," Counsel testified that before trial he told Petitioner that the outcome of the case would likely be unfavorable, and that Petitioner should strongly consider the State's offer of eight years at 100-percent service. According to Counsel, it was then that Petitioner became upset and slammed the table with what Counsel thought were "primarily his hands." Counsel clarified that Petitioner's "forehead didn't appear to have red marks on it from where he was slamming into the table." Petitioner was "very upset," but he "seemed to be more upset" about pleading guilty than having "a mental health episode." The next time Petitioner met with Counsel, Petitioner stated that his medications had been adjusted and he told Counsel, "he was feeling a lot better." Therefore, Counsel testified he saw no need to request a mental health evaluation after the episode.

Counsel said that he, Co-counsel, and Petitioner had a pretrial conversation about whether Petitioner should testify on his own behalf, and they prepared for the *Momon*[2] hearing later conducted by the trial court. Counsel testified about this conversation:

> [Petitioner] seemed to understand everything we were telling him. Our advice is always we will give you our final opinion after we hear the [S]tate's proof. The big issue we had with him testifying or one big issue we had with him testifying was he had a prior felony that would come in. I believe he was still on parole or at least probation when these came up. So he was definitely still within the range that it could be brought up at trial. There's also always the threat of opening a door and there was the fact that [the victim's] testimony described somebody that was asleep. We didn't feel like we needed to put him up here to say, "I was asleep. I don't know what happened."

Counsel recalled that when the trial court conducted Petitioner's *Momon* hearing, Petitioner appeared to understand his rights regarding testifying on his own behalf, and Petitioner ultimately made the decision not to testify. Counsel added, "We always tell our client we can only give advice, but they have to make the final decision."

After hearing the proof, the post-conviction court subsequently filed a detailed written order finding that Counsel was "a credible witness" and resolving any factual disputes between Petitioner and Counsel "in favor of" Counsel. The court found that Counsel's "conduct fell within the wide range of professional assistance and certainly did not fall below an objective standard of reasonableness." The court found that Petitioner

---

[2] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

"contended he was 'asleep' during the incident, and therefore did not 'do it.'  Therefore, [Counsel] indicated a 'diminished capacity' defense was inconsistent with such defense."

Regarding prejudice, the court found that even if it had found Counsel's performance to be deficient, "the outcome of the proceedings would not have changed"; therefore, Petitioner could not show prejudice.  The court further noted that Petitioner did not call any expert witnesses to testify at the post-conviction hearing as to his mental condition, so the court "would only be speculating" as to what an expert's conclusions would have been, and even if such conclusions would have been admissible at trial.  Consequently, the post-conviction court found that Counsel was not ineffective "for not obtaining a mental evaluation" of the Petitioner and denied Petitioner relief.

## II. ANALYSIS

### Post-Conviction Relief

To obtain post-conviction relief, a petitioner must establish his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."  Tenn. Code Ann. § 40-30-103.  A petitioner bears the burden of proving the factual allegations contained in the petition by clear and convincing evidence.  *Id.* § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 296 (Tenn. 2009).  "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence."  *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses.  *Dellinger*, 279 S.W.3d at 292 (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)).  Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact.  *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)).  On appeal, a post-conviction court's factual findings will not be disturbed unless the evidence contained in the record preponderates against the findings.  *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).  On the other hand, conclusions of law are given no presumption of correctness on appeal.  *Dellinger*, 279 S.W.3d at 293; *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).  We review "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness."  *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (first citing *Felts v.*

*State*, 354 S.W.3d 266, 276 (Tenn. 2011); and then citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)).

## Ineffective Assistance of Counsel

Both the United States Constitution and the Constitution of the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. CONST. amend. VI; TENN. CONST. art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A reviewing "court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A reviewing court also cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

- 8 -

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Here, Petitioner asserts that he received ineffective assistance of counsel because Counsel's failure to have him evaluated by a mental health professional constituted deficient performance under the first prong of *Strickland*. Petitioner points to his slamming his head against a table to support his allegation that Counsel should have requested a mental health evaluation. Yet he overlooks that Petitioner and Counsel testified differently about the meeting in which Counsel and Co-counsel discussed their professional opinions regarding the likely outcome of a trial. According to Petitioner, he was banging his head against the table and having a panic attack due to his limited mental capacity. Counsel, however, testified that while it was difficult to tell exactly what parts of his body Petitioner slammed against the table, his impression was that Petitioner's reaction was because he was angry about the State's plea offer—not because of a mental disability. The post-conviction court expressly credited Counsel's testimony in any factual disputes between Petitioner and Counsel, as was its prerogative. "[Q]uestions concerning the credibility of the witnesses, the weight and value to be given [to] their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456.

During his testimony at the post-conviction hearing, Petitioner admitted he never told Counsel about his mental issues. Counsel testified that while he briefly considered Petitioner's mental health, he determined that it was incompatible with Petitioner's defense that he did not commit the crimes of which he was accused. Counsel was an experienced defense attorney who had requested mental evaluations "many times," but saw no need for one in Petitioner's case. Further, Petitioner was able to communicate with the trial court about aspects of his case, including whether he wanted to testify on his own behalf.

After our review, we conclude that nothing in the record preponderates against the post-conviction court's factual finding that Counsel's testimony was credible, and therefore, he was effective in his representation. *See Merritt v. State*, No. W2021-01448-CCA-R3-PC, 2022 WL 17077555, at *13 (Tenn. Crim. App. Nov. 18, 2022) (concluding the post-conviction correctly determined trial counsel was effective when the evidence did not preponderate against its findings), *perm. app. denied* (Tenn. Mar. 8, 2023); *Payne v.*

*State*, No. E2021-01017 CCA-R3-PC, 2022 WL 3683793, at *8 (Tenn. Crim. App. Aug. 25, 2022) (same), *no perm. app. filed*.

We also agree with the post-conviction court that Petitioner failed to prove by clear and convincing evidence that he was prejudiced by Counsel's failure to seek a mental evaluation. As noted above, an expert's opinion would have had no bearing on Petitioner's defense that he was asleep during the abuse. And as the post-conviction court correctly recognized, Petitioner called no witnesses at the hearing to testify regarding Petitioner's mental health, and neither the post-conviction court, nor this court will speculate what a witness would have said. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.") *perm. app. denied* (July 2, 1990). Accordingly, Petitioner is not entitled to relief on this issue.

### III. CONCLUSION

In consideration of the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying Petitioner post-conviction relief.

_____
MATTHEW J. WILSON, JUDGE