IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 13, 2011

## JACKIE HARDIN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 95037      Jon Kerry Blackwood, Judge**

**No. E2011-00567-CCA-R3-PC - Filed March 12, 2012**

Petitioner, Jackie Hardin, appeals the denial of post-conviction relief from her aggravated assault conviction, claiming she was denied effective assistance of counsel. Petitioner alleges that trial counsel failed to call important witnesses, did not allow her to testify, and failed to conduct discovery. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J. and JOHN EVERETT WILLIAMS, J., joined.

Mart S. Cizek, Clinton, Tennessee (on appeal) and Russell Greene, Knoxville, Tennessee (at trial) for the petitioner, Jackie Hardin.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Eugene Nichols, District Attorney General; Kenneth F. Irvine, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Procedural History

A Knox County Grand Jury returned an indictment against petitioner, charging her with three counts of aggravated assault. A jury convicted petitioner of one count of aggravated assault and two counts of the lesser-included offense of assault. The trial court merged the assault convictions with the aggravated assault conviction and sentenced petitioner to thirteen years as a Range II persistent offender. On appeal, this court affirmed the jury verdict, but remanded the case to the trial court with instructions to enter an order

reflecting that the two assault convictions merged with the aggravated assault conviction. Petitioner did not seek second tier appellate review.

Petitioner filed a timely petition for post-conviction relief on June 10, 2010. The court held a hearing on February 18, 2011, and issued a written opinion denying the petition on March 10, 2011. This appeal follows.

## II. Facts from the Trial

In the direct appeal from the trial of this case, a panel of this court recited the following facts established at trial:

> Brittany Hurst testified that she was fourteen years old at the time of the offense. On August 25, 2004, she, along with her mother, Melissa Hurst Murray, and two young cousins, drove to a local fast food restaurant for dinner between 6:00 p.m. and 6:30 p.m. Ms. Murray pulled into the line at the drive-through window. Ms. Hurst said that she saw a blue Toyota Camry in line ahead of her family and recognized Brittany Miller and Jonathan Smith as the occupants of the vehicle. Ms. Hurst said that she attended the same middle school as Ms. Miller, and that she had known Mr. Smith for a few months. Ms. Hurst and Ms. Miller had had a dispute earlier that day at school. Ms. Hurst and Ms. Miller signed a "contract" stating that the two young women would not engage in any future altercations.
>
> Ms. Hurst said that her mother got out of the vehicle to talk to Ms. Miller about the incident at school, but Ms. Miller and Mr. Smith drove off before Ms. Murray reached their vehicle. Ms. Murray returned to her own vehicle, and the group proceeded through the drive-through line.
>
> Ms. Hurst said that when they reached the window to pay for their order, the blue Camry entered the restaurant's parking lot through the exit lane and pulled up to the passenger side of Ms. Murray's vehicle where Ms. Hurst was sitting. Ms. Hurst said that John Hardin, Defendant's husband, was driving the Camry, Defendant was in the front passenger seat, Ms. Miller was sitting in the back seat behind Mr. Hardin, and Mr. Smith was sitting behind Defendant. Mr. Smith got out of the Camry and began to yell profanities and jumped up and down. Mr. Smith approached Ms. Miller's open car window and slapped her. Ms. Hurst said that Mr. Smith then struck her in the face with his fist.

Ms. Hurst attempted to hit Mr. Smith and eventually hit him in the neck. Ms. Murray got out of her vehicle and began fighting with Mr. Smith. Defendant exited the Camry and struck Ms. Murray in the back of the head. Ms. Murray fell to the ground. Defendant pulled Ms. Murray's head up by her hair and struck Ms. Murray in the face with her fist several times. Ms. Hurst said that she noticed that Defendant was wearing brass knuckles on her hand.

Ms. Hurst asked Defendant to stop hitting her mother. Defendant responded, "Well, she was going to hit my f----g daughter." Ms. Hurst told Defendant that Ms. Murray just wanted to talk to Ms. Miller. A woman approached the group with a baseball bat, and Mr. Smith and Defendant returned to their vehicle, and Mr. Hardin drove off.

Police officers and emergency personnel arrived at the scene. Ms. Hurst said that Ms. Murray lost consciousness when Defendant first struck her in the back of the head but revived before the ambulance arrived. Ms. Hurst said that Ms. Murray was able to talk, but she was "talking weird stuff." Ms. Hurst said that her mother spent a number of hours in the emergency room before being released.

On cross-examination, Ms. Hurst acknowledged that she and Ms. Miller had been having problems for a period of time. Ms. Hurst denied that Ms. Miller knew that Ms. Murray could be violent at times. Ms. Hurst said that Defendant lived near the fast food restaurant, and Defendant and the others arrived approximately five minutes after Mr. Smith and Ms. Miller initially drove off. Ms. Hurst denied striking Mr. Smith first. Ms. Hurst said that she had seen brass knuckles at Defendant's house before the incident.

Ms. Murray testified that she, Ms. Hurst, and Ms. Murray's two nieces arrived at the fast food restaurant between 6:00 p.m. and 6:30 p.m. on August 25, 2004. Ms. Murray said that she noticed Ms. Miller and Mr. Smith in a blue Camry in front of her vehicle. Ms. Murray explained that Ms. Hurst and Ms. Miller had a disagreement earlier that day at school, and Ms. Murray wanted to tell Ms. Miller that she, Ms. Murray, was glad that the two young women had resolved their differences. Ms. Murray said that Ms. Miller had lived with her family for approximately one year, and Ms. Murray treated Ms. Miller like a daughter. Mr. Smith and Ms. Miller drove off before Ms. Murray could speak to them.

Ms. Murray said that the group ordered food and proceeded to the next window. The blue Camry returned and pulled in next to her vehicle. Mr. Smith got out of the car "in a rage" and was cursing. Ms. Murray said that Mr. Smith slapped Ms. Hurst, and Ms. Murray got out of her vehicle to defend her daughter. Mr. Smith struck Ms. Hurst with his fist, bruising her chin. Ms. Murray said that Ms. Hurst did not strike Mr. Smith first. Ms. Murray acknowledged that she and Mr. Smith exchanged blows, and then her next recollection was waking up in the emergency room.

Ms. Murray said that as a result of the incident, she sustained a fractured cheekbone, a broken nose, and a concussion on the lower back of her head. Ms. Murray stayed in the emergency room until approximately 6:30 a.m. Ms. Murray stated that there were still bone fragments in her cheek, and the doctor told her that her cheekbone would shatter if she were again struck on that side of her face. Ms. Murray said that the blows damaged her sinus cavity which would probably require future surgery. Ms. Murray stated that she did not have feeling in her teeth caused by the cheekbone fracture and continued to have trouble chewing on that side of her face. Ms. Murray also continued to have headaches as a result of the blow to the back of her head. Ms. Murray said that she no longer liked to have her photograph taken because her lip drooped on the side of her face where she sustained her injuries. Ms. Murray described the pain from her injuries as "excruciating."

On cross-examination, Ms. Murray said that she approached the blue Camry at a normal walking pace. Ms. Murray said that the blue Camry returned approximately ten to fifteen minutes later while Ms. Murray was waiting to pick up her order. Ms. Murray acknowledged that she was angry when she got out of her vehicle and approached Mr. Smith. Ms. Murray could not remember which of them struck the other first, but she agreed that she and Mr. Smith exchanged blows. Ms. Murray stated that she was five feet, three inches tall, and that Mr. Smith was approximately six feet to six feet, two inches tall. Ms. Murray said that Mr. Smith struck her in the face approximately two times. Ms. Murray did not remember Defendant getting out of her vehicle or approaching Ms. Murray. Ms. Murray said that she did not recollect testifying at the preliminary hearing that she saw Defendant approach her wearing brass knuckles. Ms. Murray said that all of the blows from Mr. Smith and Defendant were directed toward the left side of her face. Ms. Murray denied that Mr. Smith had stolen something from her prior to the incident or that Ms. Hurst had harassed Ms. Miller at school.

The State rested its case-in-chief, and Defendant presented her defense. Brittany Miller testified that she was ordering food at a fast food restaurant on August 25, 2004, when she looked in her rear view mirror and saw Ms. Murray running toward her vehicle with her hand balled into a fist. Ms. Miller said she was scared because prior to the incident, Ms. Murray had telephoned her house and threatened her. Ms. Miller also said that Ms. Hurst had previously attempted to run Ms. Miller's vehicle off the road. When Ms. Miller told Defendant and Mr. Hardin about the incident, Mr. Hardin said that he wanted the conflict to end, so the four of them returned to the fast food restaurant.

When the group arrived at the restaurant, Ms. Miller said that Mr. Smith jumped out of the vehicle, screaming, and walked up to Ms. Hurst. Ms. Hurst slapped Mr. Smith, and he returned the blow. Ms. Miller said that Ms. Murray got out of her vehicle and struck Mr. Smith. Ms. Murray and Mr. Smith exchanged blows approximately three times, and then Ms. Murray fell to the ground. Ms. Miller saw Ms. Murray lying on the ground. Ms. Miller said that Defendant got out of the vehicle and bent over Ms. Murray. Ms. Miller heard Defendant say, "Just don't do it, Missy. Don't do it." Mr. Hardin got out of the vehicle and said, "There's no sense in this." Mr. Hardin ordered Defendant, Ms. Miller, and Mr. Smith back into their vehicle, and the group left the fast food restaurant. Ms. Miller denied that Defendant struck Ms. Murray or that Defendant had brass knuckles.

On cross-examination, Ms. Miller said that she was driving the Camry when she and Mr. Smith first arrived at the fast food restaurant, and she acknowledged that she did not have a driver's license. Ms. Miller described various incidents when Ms. Hurst and her friends had driven repeatedly past Ms. Miller's house, screaming and throwing things, or called her on the telephone. Ms. Miller said that Ms. Hurst and her friends had tried to run Ms. Miller's car off the road. Ms. Miller said that her parents had called the police on several occasions to report the incidents.

Ms. Miller reiterated that it was Mr. Hardin's idea to return to the fast food restaurant because he wanted "to calm it down." Mr. Hardin was the only one who was supposed to get out of the vehicle, but Mr. Smith was angry. Mr. Smith got out of the car and yelled at Ms. Hurst, "Just leave my girlfriend alone." At that point, Ms. Miller stated that Ms. Hurst slapped Mr. Smith. Ms. Miller said that Mr. Hardin got out of the vehicle when Ms. Murray and Mr. Smith started fighting and yelled at Mr. Smith and Ms. Murray to stop fighting.

Ms. Miller said that after the incident, Mr. Hardin drove her and Mr. Smith to her grandmother's house, and Defendant and Mr. Hardin returned to their house. Ms. Miller stated that she called the police from her grandmother's house and reported the incident.

Valerie Ridley testified that she was living with Ms. Murray at the time of the incident. Ms. Ridley said that after the preliminary hearing, Ms. Murray offered her one hundred dollars if Ms. Ridley would testify that she was with Ms. Murray on August 25, 2004, and that she saw Defendant wearing brass knuckles when she struck Ms. Murray. Ms. Ridley said that she was working that night and refused Ms. Murray's offer. Ms. Ridley said that she did not report the incident to the police because she did not want to get Ms. Murray into trouble. Ms. Ridley stated that she and Ms. Hurst were best friends at the time of the incident, but the young women were not speaking at the time of the trial.

On cross-examination, Ms. Ridley said that Ms. Hurst knew she was at work on August 25, 2004, because Ms. Hurst called her at her place of employment and told her about the incident. At some point after the incident, Ms. Murray became angry with Ms. Ridley and made Ms. Ridley leave her house. Ms. Ridley said that she had known Ms. Miller all of her life and was still friends with Defendant and Ms. Miller. Ms. Ridley said that she told Ms. Miller about Ms. Murray's offer a few months before trial.

The State called Ms. Murray as a rebuttal witness. Ms. Murray testified that she did not offer Ms. Ridley money in exchange for her testimony at trial. Ms. Murray said that she knew that Ms. Ridley was not listed on the police report as a witness and that Ms. Ridley was at work when the incident occurred.

*State v. Jackie Hardin*, No. E2007-01171-CCA-R3-CD, 2009 WL 1704493, at *1-4 (Tenn. Crim. App. June 18, 2009).

### III. Testimony from the Post-Conviction Hearing
#### A. Testimony of Jonathan Smith

Jonathan Smith was petitioner's co-defendant in the trial court. He pled guilty to aggravated assault and was incarcerated at the time of the hearing on the post-conviction petition. Mr. Smith was serving a sentence in the Tennessee Department of Correction as a result of a violation of his probation in this case. He has at least two other felony convictions in addition to the aggravated assault conviction. According to Mr. Smith,

-6-

petitioner's trial counsel never contacted him to interview him or to ask him to testify at trial. Mr. Smith would have testified on petitioner's behalf if he had been subpoenaed.

Had Mr. Smith been called to testify at trial, he would have testified that he and Brittany Miller were in the drive-through of McDonald's when Ms. Hurst came through the drive-through. Upon seeing Ms. Hurst, Mr. Smith and Ms. Miller left McDonald's and went to Ms. Miller's home. At one point, Mr. Smith said that they left McDonald's in order to "avoid the situation." Mr. Smith then testified that they returned to McDonald's with petitioner and her husband John Hardin so they could "settle the situation." It was Mr. Smith's idea to return to McDonald's. Mr. Smith exited the vehicle because he was angry. It was not his intention to start a fight, but he was upset. He approached the vehicle, focused on both the driver and the passenger. Melissa Hurst Murray[1], the driver, exited the vehicle to defend her daughter, the passenger. Mr. Smith then entered into a physical altercation with mother and daughter.

Petitioner did not encourage Mr. Smith in the altercation at any time. He heard someone saying, "Get back in the car!" Mr. Smith did not know whether petitioner exited the vehicle because it was behind him. He did not witness petitioner strike anyone because he was focused on the victim. He did not see petitioner strike the victim in the back of the head, and was relatively sure that she had not done so. He would have been in a position to see petitioner strike the victim if she had done so. Mr. Smith did not see petitioner strike the victim in the face with brass knuckles. He did not have brass knuckles, and did not see anyone else in possession of brass knuckles. According to Mr. Smith's testimony, he did not know what the other people who came to McDonald's with him were doing, but he knew that no one in front of him was committing any crime. Any allegation that petitioner became involved in the altercation with Ms. Hurst [Murray] along with Mr. Smith would be false.

## B. Testimony of John Hardin

Petitioner's husband John Hardin was never contacted by petitioner's attorney before trial. He would have testified on her behalf, but trial counsel assured petitioner that she had nothing to worry about. Mr. Hardin would have testified that on the day of the altercation, Mr. Smith and his daughter Brittany Miller drove up to their home. Ms. Miller was scared and crying. She stated that Ms. Murray and Ms. Hurst had approached her at McDonald's

_____

[1] This court's statement of the facts from the trial of *State v. Hardin* refers to Brittany Hurst as "Ms. Hurst" and her mother, Melissa Hurst Murray, as "Ms. Murray." Throughout the testimony from the post-conviction hearing, the term "Ms. Hurst" is used interchangeably with reference to the two individuals. This court has attempted to clarify the participants for the reader by noting [Murray] when referencing Melissa Hurst Murray. Ms. Murray is also referred to as "Missy Hurst" herein.

and she was afraid. Mr. Hardin intended to go to McDonald's to ask everyone to put an end to the arguing. The altercation at McDonald's was the culmination of a conflict between the two girls, Brittany Miller and Brittany Hurst, that had begun at school. Mr. Hardin did not intend to start a fight, but Mr. Smith jumped out of the car and started fighting. Mr. Smith first approached Brittany Hurst and she slapped him. Mr. Smith hit her. Ms. Hurst's mother, Ms. Murray, exited the vehicle to defend her daughter. Mr. Smith hit Ms. Murray and she hit the ground. Mr. Smith struck Ms. Murray again. Ms. Hardin exited the vehicle, but did not touch Ms. Murray. Ms. Hardin advised Ms. Murray to stay down so that Mr. Smith would stop hitting her. Mr. Hardin stated that no one had brass knuckles.

Mr. Hardin stated that petitioner told him repeatedly that trial counsel assured petitioner that she had nothing to worry about at trial. Mr. Hardin further stated that when petitioner was convicted on a theory of criminal responsibility, trial counsel considered it a victory because it was the lowest felony conviction she could have received. Mr. Hardin never called trial counsel personally. He never spoke to trial counsel when he attended court. Mr. Hardin never communicated to his wife that her attorney needed to call him.

C. Testimony of Petitioner

According to petitioner, during the year between the time that the court appointed her attorney until trial, she met with counsel perhaps twice in his office. The remainder of their meetings were outside of the courtroom. Petitioner and her daughter went to trial counsel's office together for the first visit. He wanted to hear petitioner's side of the story. She did not recall the content of the second meeting. Trial counsel never talked with Mr. Hardin or Mr. Smith prior to trial although petitioner told trial counsel that her husband would be willing to testify. She also advised trial counsel that Mr. Smith was in prison but would testify. Petitioner's trial counsel did not indicate whether he had conducted an investigation of her case. Trial counsel informed petitioner that the State had offered a plea agreement involving a six-year sentence, but he advised against taking the plea offer. He assured petitioner that he was a good trial lawyer. Trial counsel did not tell petitioner whether the six-year sentence would involve jail time or probation. According to petitioner, he also failed to advise her about the range of punishment she would face, should she be convicted. Petitioner and her lawyer discussed whether she should testify at trial, and he advised against it. Petitioner stated that trial counsel made the actual decision about whether she should testify.

Had petitioner testified on her own behalf at trial, she would have told the jury that on the day of the altercation, her daughter came home crying and hysterical. Her daughter told her that while she and Mr. Smith were in the drive-through at McDonald's, Missy Hurst [previously referred to as Melissa Hurst Murray] pulled up. Ms. Hurst [Murray] exited her

vehicle and attempted to assault Ms. Miller through the car window. Upon hearing this, petitioner, Mr. Hardin, Mr. Smith, and Ms. Miller got into the vehicle and drove to McDonald's. Mr. Hardin was going to get out, but Mr. Smith jumped out first.

The passenger door handle on the vehicle was broken, so petitioner could not exit the vehicle initially. She saw Mr. Smith approach Ms. Hurst's and Ms. Murray's vehicle. Mr. Smith was yelling at Ms. Hurst through the open car window when petitioner witnessed Ms. Hurst hit Mr. Smith. Mr. Smith struck Ms. Hurst in return. Ms. Murray exited the vehicle and struck Mr. Smith. Mr. Smith then struck Ms. Murray, knocking her to the ground. Ms. Murray continued to get up, but Mr. Smith would knock her to the ground again. This happened two or three times.

At that time, Ms. Miller had opened her door and had opened petitioner's door from the outside. Petitioner was urging Ms. Murray to stay down so that Mr. Smith would stop hitting her and knocking her to the ground. Petitioner never struck Ms. Murray in the back of the head and never struck Ms. Murray in the face with brass knuckles. Petitioner never saw anyone with brass knuckles.

At the conclusion of the jury trial and subsequent proceedings in the trial court, petitioner appealed to this court. When this court issued its ruling, a bonding company called petitioner to advise her of the adverse ruling. Petitioner then contacted her attorney who informed her that he had intended to call her. Petitioner's attorney told petitioner that this court had reached a decision, but that the opinion would not be released until she was in custody. Petitioner began her sentence two months later. Petitioner did not speak with her lawyer again until she went to jail. She entered custody on August 26, but did not speak to counsel until October. He never informed her verbally nor wrote a letter advising her of the right to seek second tier appellate review.

In response to the allegations of the post-conviction petition, the State pointed out that trial counsel was not petitioner's original counsel. Petitioner's first attorney, retained by petitioner, filed a motion to withdraw alleging that petitioner kept missing appointments. Petitioner contended that he withdrew because they could not afford to pay him the additional money they owed him. Petitioner failed to appear for the first setting of her trial, for which the trial court issued a warrant. Petitioner was arrested on the warrant. Petitioner admitted that she had several arrests for failure to appear in general sessions court. Despite her history of failing to appear, the trial court allowed petitioner to post an appeal bond and remain free until this court issued an opinion. When the bonding company called petitioner, an individual informed her that she needed to turn herself in. Petitioner again failed to appear and was eventually taken into custody.

Petitioner acknowledged that she had convictions for theft and fraud and did not know how many other prior convictions she had from other counties. She was aware from plea agreements in association with prior cases that the convictions would be used to enhance any future sentences. Petitioner admitted that even without counsel explicitly informing her that her prior convictions could be used for enhancement, she knew that she would face an increased sentence upon conviction in this case. Following the admission, petitioner then stated that she believed that the prior convictions had to be violent offenses in order to enhance a sentence.

Petitioner believed that trial counsel failed to investigate her case thoroughly. She alluded to a video tape from the parking lot of McDonald's. Petitioner's first trial counsel allegedly had possession of the tape, but petitioner did not see the tape again after the preliminary hearing. She was unaware if counsel ever saw the tape.

Petitioner did not think that trial counsel had engaged in discovery on her behalf. She stated that she never saw a motion for discovery or the court file. The State pointed out that the court file contained motions for discovery.

IV. Analysis

Each of petitioner's alleged grievances involves a claim of ineffective assistance of counsel.

A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40–30–110(f)(2006); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 216).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Questions regarding the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996)). The post-conviction court's findings of fact carry the weight of a jury verdict and are conclusive on appeal unless the preponderance of the evidence is otherwise. *Rigger v. State*, 341 S.W.3d 299, 306 (Tenn. Crim. App. 2010) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Rigger*, 341 S.W.3d at 306 (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective

assistance of counsel claims is *de novo* with no presumption of correctness. *Dellinger*, 279 S.W.3d at 294 (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

In order to prevail on her claim of ineffective assistance of counsel, petitioner must demonstrate both that her lawyer's performance was deficient and that the deficiency prejudiced the defense. *Finch*, 226 S.W.3d at 315; *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975)). To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "reasonableness under prevailing professional norms." *Finch*, 226 S.W.3d at 315 (quoting *Strickland*, 466 U.S. at 688). As our supreme court has previously held:

> '[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.'

*Baxter*, 523 S.W.2d at 934–35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir.1974)); *Finch*, 226 S.W.3d at 316. On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689); s*ee Finch*, 226 S.W.3d at 316.

To establish that petitioner suffered prejudice as a result of counsel's deficient performance, petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch*, 226 S.W.3d at 316 (quoting *Vaughn*, 202 S.W.3d at 116, and citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694); s*ee Finch*, 226 S.W.3d at 316. As such, petitioner must establish that her attorney's deficient performance was of such magnitude that she was deprived of a fair trial and the reliability of the outcome was called into question. *Id*. (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner must establish both deficient performance and prejudice therefrom to be entitled to post-conviction relief. *Id.* (citing *Howell*, 185 S.W.3d at 326). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Id.* (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)).

The post-conviction court made several findings of fact that carry the weight of a jury verdict on appeal. The court found that many of the allegations of ineffective assistance of counsel involved the three witnesses who testified at the post-conviction hearing: Jonathan Smith, John Hardin, and petitioner. The post-conviction court found that Mr. Smith and petitioner were not credible witnesses because of their extensive criminal histories. The court further found that Mr. Hardin's testimony lacked credibility because he is petitioner's husband. The post-conviction court also stated that petitioner addressed this issue without regard to the theory of criminal responsibility for the conduct of another, i.e., Mr. Smith, under which she was convicted. In recognizing this theory, the court found that Mr. Hardin's testimony would have supported the State's case at trial. Mr. Hardin's testimony established that the four individuals traveled to McDonald's together, at which time Mr. Smith began striking the victim. Mr. Hardin confirmed that at some point during the altercation, petitioner exited the vehicle and injected herself into the situation.

The post-conviction court found a factual basis upon which to rule that petitioner caused the situation whereby she did not receive notice regarding the availability of second tier appellate review. Petitioner had a history of failing to appear in various courts and failed to turn herself in upon notification of this court's adverse ruling. Had petitioner reported to jail as instructed in a timely manner rather than having to be arrested two months later, counsel would have been able to communicate her appeal options to her within the prescribed time period. Petitioner cannot now avail herself of redress through post-conviction proceedings for an error that she participated in creating.

This court also agrees with the post-conviction court's conclusion of law pertaining to petitioner's second tier appellate review. We conclude that the "fugitive disentitlement doctrine" is applicable to the facts of this case. *See State v. Robert L. Adams*, No. M2010-00916- CCA-R3-CD, 2011 WL 5554385 (Tenn. Crim. App. Nov. 8, 2011); *Bradford v. State*, 202 S.W.2d 647 (Tenn. 1947). In *Bradford*, our supreme court held that "'a defendant who escapes and becomes a fugitive from justice while his motion for a new trial is pending' has 'by his own act . . . waived the right to have his motion for a new trial considered and determined.'" *Robert L. Adams*, at *8 (quoting *Bradford,* 202 S.W.2d at 648). Though the *Bradford* court applied the doctrine to a matter involving a motion for new trial, the principles apply equally to the instant case. The *Bradford* court opined that "'the proceedings [concerning a motion for new trial] are commenced and prosecuted by the defendant,' not the State, and consequently the defendant's act of fleeing the jurisdiction '[was] in legal effect an abandonment of the prosecution of his motion.'" *Robert L. Adams*, at *9 (quoting *Bradford*, 202 S.W.2d at 647-49). The same rationale holds true in matters involving appellate review. The appeal was initiated by petitioner. By willfully violating the order to report to jail upon notice of an adverse ruling by this court, petitioner abandoned her

right to second tier appellate review. "As a matter of policy, courts should not 'give their time to proceedings which, for their effectiveness, must depend upon the consent of an escaped convict.'" *Robert L. Adams*, at *9 (quoting *Bradford*, 202 S.W.2d.at 648). We agree that the fugitive disentitlement doctrine "is sound public policy to discourage the absence and flight of those individuals who disagree with court orders and judgments but still seek [judicial] relief." *Robert L. Adams*, at *9 (quoting *Searle v. Juvenile Court for Williamson County*, 188 S.W.3d 547, 551 (Tenn.2006)).

This court has concluded that the evidence does not preponderate against the post-conviction court's findings of fact. We credit the court's findings with the weight of a jury verdict. Incorporating the post-conviction court's findings of fact, we further hold petitioner suffered no prejudice as a result of counsel's failure to secure the testimony of the witnesses. The testimony would not have negated, and would only have supported, the theory of criminal responsibility under which petitioner was convicted. We have also determined that petitioner suffered no prejudice from the lack of second tier appellate review. Petitioner raised two issues on appeal: whether the evidence was sufficient to support the jury's finding of "serious bodily injury"; and whether the jury verdict form improperly characterized criminal responsibility for aggravated assault as a lesser-included offense. A panel of this court issued a prior opinion thoroughly addressing both issues. Having been denied relief on both issues, this court does not conclude that the outcome would have been different in the state supreme court.

## V. Conclusion

Having thoroughly reviewed the record of the post-conviction proceedings, this court holds that petitioner has failed to prove by clear and convincing evidence that her counsel was ineffective.

Accordingly, we affirm the judgment of the post-conviction court denying relief.

                               _____

                               ROGER A. PAGE, JUDGE.