IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2018

**DEANGELO JACKSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01259       James M. Lammey, Judge**

_____

**No. W2017-00916-CCA-R3-PC**

_____

The petitioner, Deangelo Jackson, appeals the denial of post-conviction relief from his convictions for especially aggravated robbery, attempted second-degree murder, and employing a firearm during the commission of a dangerous felony. On appeal, the petitioner alleges he received ineffective assistance of counsel due to trial counsel's failure to call material witnesses at trial. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Kirk W. Stewart, Memphis, Tennessee, for the appellant, Deangelo Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Tyler Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### A.       Trial Proceedings and Direct Appeal

A Shelby County jury convicted the petitioner of especially aggravated robbery, attempted second-degree murder, and employing a firearm during the commission of a dangerous felony. *State v. Deangelo Jackson aka Deangelo Webb*, No. W2014-01981-CCA-R3-CD, 2015 WL 7526949, at *1 (Tenn. Crim. App. Nov. 24, 2015). On appeal, this Court affirmed the petitioner's convictions. *Id.* When doing so, this Court rendered this summary of the underlying facts and procedural history:

At trial, Mr. Rivas testified that, around 11:00 p.m. on the night of the offense, he and two friends were pushing a car into a carwash parking lot. Mr. Rivas recalled that the area was dark but there were some street lamps. While they were pushing the car, two people approached them from behind, one of whom had a gun. The gunman fired a shot into the air, and Mr. Rivas' companions ran. The gunman placed the gun against Mr. Rivas' head and ordered him "to get down on the floor, right next to the car." Mr. Rivas complied to avoid being shot. The gunman then demanded Mr. Rivas' wallet. As Mr. Rivas was handing the gunman his wallet, he turned to see the gunman. The gunman said, "Don't look at me" and shot Mr. Rivas in the back. The gunman then demanded Mr. Rivas' phone. Again, Mr. Rivas handed the gunman his phone and turned to look at the gunman. The gunman said, "I told you, I'm going to kill you. Don't look at me." He then shot Mr. Rivas in the back a second time. The entire episode lasted "three to five minutes," and the two robbers ran after they shot Mr. Rivas the second time. Mr. Rivas explained that he did not see the gun, but he saw the gunman "twice quickly." Mr. Rivas recalled that the gunman was wearing a hoodie that covered more of his hair and face, but Mr. Rivas saw the gunman's face. Mr. Rivas identified [the petitioner] as the gunman.

After the [petitioner] and his companion had left the scene, Mr. Rivas looked around and saw that his friends were gone. Mr. Rivas managed to get up and walk to a convenience store to find a phone. People in the store called the police and an ambulance for him. The gunshots went through Mr. Rivas' large intestine, coccyx (tailbone), and one of his testicles. Mr. Rivas underwent multiple surgeries and wore a colostomy bag for a year. At the time of trial, he still experienced pain from the injuries and could not sit for more than forty-five minutes to an hour.

About two weeks after the date of the offense, officers from the Memphis Police Department ("MPD") asked Mr. Rivas to view several photo lineups. Mr. Rivas viewed the lineups, circled the [petitioner's] photo, and wrote, "This is the one who robbed me and shot me." Mr. Rivas explained that he circled the [petitioner's] photo "right away" when he saw it. Mr. Rivas also stated that, although the street lights in the area were not consistently illuminated, there was a street lamp directly above his car, and he was able to get a clear look at the [petitioner's] face. Mr. Rivas said he was "a hundred percent" sure that the [petitioner] was the person who shot him.

Mr. Rivas also confirmed that he testified at a preliminary hearing in 2012. Mr. Rivas admitted that he had "a little bit of confusion that day" and had trouble identifying the [petitioner] because the [petitioner] was not wearing a hoodie and was wearing glasses at the time. As a result of his confusion, Mr. Rivas initially identified the [petitioner] as the person who shot him but then identified someone else who looked similar to the [petitioner] who was not wearing glasses. Mr. Rivas explained that the [petitioner] was not wearing glasses at the time of the offense and that, on the day of the preliminary hearing, Mr. Rivas was under the influence of pain medication.

On cross-examination, Mr. Rivas denied telling a police detective on the day after the offense that he did not see the robber's face. Mr. Rivas also recalled that, at the preliminary hearing, "they did make everyone take off their glasses." Mr. Rivas noted that he identified someone else at the preliminary hearing, but he stated that he switched his identification back to the [petitioner]. Mr. Rivas was permitted to listen to a recording of the preliminary hearing outside of the jury's presence in order to refresh his memory. After listening to the recording, Mr. Rivas admitted that he identified a person named Kendrick Brown as the robber at the preliminary hearing. However, Mr. Rivas insisted that he "came back to the defendant." On redirect examination, Mr. Rivas said he was "very positive" that the [petitioner] was the person who robbed and shot him.

Marion Hardy testified that, on the night of the offense, he was helping Mr. Rivas and Jeremy Holmes push Mr. Rivas' car out of a carwash parking lot. As the three men were moving the car, two other men, one of which Mr. Hardy knew, were standing on the sidewalk. Mr. Hardy thought that both men were carrying guns. Mr. Hardy stated that he recognized one of the men as a person he knew as "Mulah." Mr. Hardy identified the [petitioner] as "Mulah."

After Mr. Hardy had seen the two men, "all of a sudden" someone shot over Mr. Hardy's, Mr. Rivas', and Mr. Holmes' heads. Mr. Hardy and Mr. Holmes "stood back," and Mr. Hardy saw someone "put [Mr. Rivas] in the car." Then he heard one gunshot and assumed someone had shot Mr. Rivas. After that, "two [additional] guys came from behind the building" and shot over Mr. Hardy and Mr. Holmes' heads. Mr. Holmes "took off running," but Mr. Hardy lay down on the ground and gave the two other robbers his wallet. After surrendering his wallet, Mr. Hardy ran away. He

- 3 -

did not see what happened with the [petitioner] and the man who was with him.  After the robbers left, Mr. Hardy saw Mr. Rivas stagger from his car and collapse in front of a barber shop.

Later, Mr. Hardy gave a statement to police and viewed a photo lineup.  Mr. Hardy identified a photo of the [petitioner] and wrote, "robbery, the mean friend" under his picture.  Mr. Hardy explained his notation, stating, "I never did think Mulah was that kind of person.  He didn't seem like he was that kind of person when I first met him."  However, Mr. Hardy's opinion of the [petitioner] changed when he saw him participate in the robbery.  Mr. Hardy stated that he was "ninety-nine percent" sure that the [petitioner] was one of the two men that robbed and shot Mr. Rivas.  Mr. Hardy agreed that ninety-nine percent was "about as certain as it gets."

On cross-examination, Mr. Hardy confirmed that he gave a statement to police the day after the offense but he did not identify the [petitioner] as one of the robbers at that time because "[t]hey didn't ask [him]."  Defense counsel then read a portion of Mr. Hardy's statement in which the police asked, "Can you identify the suspects that you saw [if you saw] them again?" and Mr. Hardy responded, "I think so."  Mr. Hardy admitted that he made that statement but maintained that he did not identify the [petitioner] because he did not know the [petitioner's] real name and because the police had not shown him a photo of the [petitioner].  Mr. Hardy also admitted that, three days after the offense, he called police out to the carwash and told them that a man sitting on the newspaper stand, Travis Brown, was one of the people involved in the robbery, but he still did not identify the [petitioner].  Mr. Hardy explained that he first identified the [petitioner] to the police when the police showed him the photo lineup containing the [petitioner's] picture.  When Mr. Hardy saw the [petitioner's] picture and said "Mulah," the police informed him of the [petitioner's] name.  On redirect examination, Mr. Hardy stated that he alerted the police to Mr. Brown because he thought Mr. Brown was involved in setting up the robbery.

Jeremy Holmes testified that, on the night of the offense, he was helping Mr. Rivas and Mr. Hardy push a car into a parking spot in a carwash parking lot so that Mr. Rivas could advertise the car as being for sale.  Mr. Holmes asked two people who were walking down the sidewalk to help them push the car.  However, before Mr. Holmes finished his sentence, one of the individuals pulled out a pistol and fired a shot into the

- 4 -

air. Mr. Holmes "saw fire shoot out of the barrel" and ran. Mr. Holmes heard "like another three shots" as he was running. After the incident, Mr. Holmes saw Mr. Rivas walking down the sidewalk. Mr. Holmes told him to sit down because he could see blood dripping from Mr. Rivas' body, but Mr. Rivas acted as if he did not want to sit down. Mr. Holmes gave a statement to police and said he did not know the people who had committed the robbery. However, he later viewed a photo lineup, picked out a photo, and wrote, "I think this is the guy that shot in the air when [Mr. Rivas] was robbed, but I'm not one hundred percent sure." Mr. Holmes explained that the photo looked familiar but he was not sure of his identification because the robber had a hood on and he did not "want to falsely say, you know, what [he] didn't really see." On cross-examination, Mr. Holmes acknowledged that he did not see Mr. Rivas being robbed because he was running from the scene.

MPD Officer Eric Hutchinson testified that he responded to the scene of the robbery and shooting. There, he took photos and collected evidence. Officer Hutchinson found a nine-millimeter bullet casing near the sidewalk and what appeared to be blood on the ground. Officer Hutchinson agreed that the blood evidence appeared to move away from the car toward the shopping center on the other side of the parking lot. On cross-examination, Officer Hutchinson stated that he found a bullet casing but he did not find a bullet on the scene. He did not recover a gun, wallet, or phone from the scene. Officer Hutchinson did not know if anyone collected surveillance video from any of the businesses near the scene of the robbery.

MPD Detective Fausto Frias testified that he was assigned to investigate the robbery and shooting in this case. Detective Frias went to the hospital where Mr. Rivas was being treated and spoke with Mr. Rivas. At that time, Mr. Rivas told him, "I saw who shot me, and I can identify him at a later date." While waiting for Mr. Rivas to be released from the hospital, Detective Frias spoke with some people who lived in the neighborhood where the robbery and shooting took place. Eventually, Detective Frias developed multiple suspects in the case and created several photo lineups to show the victims and other witnesses. Mr. Rivas identified the [petitioner's] photo in the fourth photo lineup. Based on that identification, Detective Frias obtained an arrest warrant for the [petitioner], but he was unable to locate the [petitioner]. After several attempts to find the [petitioner], Detective Frias called the [petitioner's] mother and told her that the police needed to talk to her son about the robbery. About an hour

- 5 -

and a half after that call, the [petitioner] called Detective Frias and told the detective where he could be found. Detective Frias interviewed the [petitioner], and the [petitioner] initially denied being present at the robbery or knowing anything about the robbery. After Detective Frias informed the [petitioner] that surveillance videos from the nearby businesses would show whether the [petitioner] was there, the [petitioner] admitted to being present at the robbery. However, the [petitioner] denied shooting anyone. He said that he heard shots and "took off running" to a friend's apartment. Detective Frias asked the [petitioner] for the friend's phone number and address, but the [petitioner] could not provide such information. The [petitioner] explained that he did not return to the scene to give a statement to police because he did not want to be involved. He also stated that he did not know who shot and robbed Mr. Rivas because he "just ran."

Detective Frias also showed the photo lineup to Mr. Holmes on the same day as the preliminary hearing. At that time, Mr. Holmes circled the [petitioner's] picture but said he was not one hundred percent sure about his identification.

On cross-examination, Detective Frias acknowledged that the [petitioner] had indicated on the Advice of Rights form that he could not read or write without the aid of eyeglasses. Detective Frias also admitted that he showed the photo lineups to the victims on different days. He explained that it was policy to show victims lineups when it was convenient for the victim.

After the State rested its case-in-chief, the trial court conducted a jury-out hearing to determine whether the [petitioner's] prior convictions could be used to impeach his testimony. The State noted that the [petitioner] had previous convictions of felon in possession of a handgun from 2011, theft of property over $1,000 from 2009, and theft of property under $500 from 2009. The [petitioner] argued that the crimes were substantially similar to the crimes for which he was being tried and that the convictions would be "substantially more prejudicial than probative." The State countered that none of the [petitioner's] prior convictions were for violent crimes. The trial court noted that "especially-aggravated robbery is a theft committed in a more egregious manner." However, the court found that the [petitioner's] prior conviction for felon in possession of a handgun was not substantially similar to any of the charges for which the [petitioner] was on trial and that his convictions for theft were probative of the [petitioner's] "dishonesty." The court allowed the State to use the

convictions to impeach the [petitioner] if he chose to testify. The [petitioner] elected not to testify.

Dr. Jeffrey Neuschatz testified as an expert in eyewitness identification. Dr. Neuschatz explained that longer exposure time, or how long someone has to evaluate or study information, will result in a better memory of what was studied. Additionally, Dr. Neuschatz explained that memory is more susceptible to impairment the longer the amount of time between the time someone studied something and the time the person was tested on what they studied. In short, Dr. Neuschatz explained that it was "[m]uch more difficult to remember things accurately when you don't get to study them for a long time and then you're tested a long time afterwards[.]"

Dr. Neuschatz stated that, based on his research, the thirteen-day gap between the robbery of Mr. Rivas and Mr. Rivas' identification of the [petitioner] constituted a long gap. Dr. Neuschatz also stated that high-stress situations, such as the robbery in this case, impaired the reliability of identifications. Additionally, Dr. Neuschatz explained that the accuracy of an identification was affected when a weapon was used because the weapon drew people's attention and made them less attentive to other aspects of the scene, such as the identity of the perpetrator. Further, studies showed that head coverings impaired eyewitness identification, and identification accuracy was much worse when people were asked to identify someone who was wearing something that covered their hairline. In this case, Dr. Neuschatz noted that identification would be impaired if the suspect was wearing a hoodie. Dr. Neuschatz also explained that a witness's confidence in their identification did not mean that the identification was accurate. This is because the witness's confidence could be affected by outside influences, such as someone telling the witness they had chosen the right person. Moreover, Dr. Neuschatz noted that people have "a great deal of difficulty" identifying someone who is of a different race than themselves. In this case, Mr. Rivas and the [petitioner] were different races.

On cross-examination, Dr. Neuschatz confirmed that a witness's identification could be accurate even if it was made in a stressful situation. He also stated that an identification was more likely to be accurate if the witness was familiar with the identified person. He also admitted that it was possible for people to accurately identify someone who was of a different race than themselves.

After deliberations, the jury convicted the [petitioner] of especially aggravated robbery in Count 1, facilitation of attempted second-degree murder as a lesser-included offense in Count 2, and employing a firearm during the commission of a dangerous felony in Count 3. The trial court, acting as the thirteenth juror, approved the verdicts in Counts 1 and 2. The State dismissed Count 3 on the ground that employing a firearm during the commission of a dangerous felony did not apply to facilitation of attempted second-degree murder. The trial court ordered consecutive sentences of twenty-two years for especially aggravated robbery and ten years for facilitation of attempted second-degree murder for an effective sentence of thirty-two years. The trial court denied the [petitioner's] motion for new trial, and this timely appeal followed.

*Id*. at \*1-5.

## B.     Post-Conviction Proceedings

The petitioner filed a timely *pro se* petition for post-conviction relief alleging numerous claims of ineffective assistance of counsel, including the failure to call alibi witnesses, Betty Webb and Darius Fleming, at trial. Following the appointment of counsel, the post-conviction court held a hearing on the motion, during which only the petitioner and trial counsel testified. According to the petitioner, he was not present at the scene of the crime. Instead, the petitioner's grandmother, Ms. Webb, drove him to a movie theater on Airways Boulevard the night at issue. The petitioner's sister, April Jackson, and his cousin, Mr. Fleming, were also in the car and went to the movie, too. While at the movie theatre, they ran into the petitioner's ex-finance. The petitioner maintained he told trial counsel that Ms. Webb and Mr. Fleming were alibi witnesses and should be called as trial witnesses. The morning of trial, however, trial counsel informed him that Ms. Webb called and indicated she and Mr. Fleming could not be present because Mr. Fleming was having seizures. The petitioner later spoke with Ms. Webb, who denied this conversation and instead stated that trial counsel called her the morning of trial and indicated she and Mr. Fleming should not come to the courthouse because they were no longer needed as witnesses. Ms. Webb died prior to the post-conviction hearing.

Trial counsel testified that at the time of trial, she had been practicing law for twenty-seven years and had been a public defender the last seventeen years. As a public defender, she had defended charges of varying complexity, from misdemeanors to first degree murder. Another attorney originally served as lead counsel, and when trial counsel received the case, an investigation had already commenced.

- 8 -

Trial counsel testified that following the incident, the petitioner told the investigating police officers that he was present at the scene of the crime but did not participate. Later, the petitioner changed his story and told investigators with the public defender's office that he was at a movie with his cousin and sister at the time of the events, and they ran into the his ex-girlfriend while at the theatre. Trial counsel was never able to locate the petitioner's ex-girlfriend. Trial counsel spoke with Ms. Jackson and Mr. Fleming, who gave different stories. Ms. Jackson could not remember what night she and the petitioner went to the movies and referenced a different theatre than Mr. Fleming, so trial counsel did not subpoena her trial testimony. Mr. Fleming recalled specific details of the evening, so trial counsel did subpoena his testimony. However, the petitioner's grandmother called the morning of trial and asked if Mr. Fleming could be excused from testifying because he was having seizures, did not remember anything, and did not want to testify. Trial counsel excused Mr. Fleming because she did not want a hostile witness present who could not offer helpful testimony. When they spoke on the telephone, Ms. Webb did not mention driving the petitioner, Mr. Fleming, and Ms. Jackson to the movie theatre on the night at issue, and the petitioner never told trial counsel that Ms. Webb drove them to the movie theatre that evening.

Trial counsel ultimately presented a defense of mistaken identity. When doing so, she called identity expert Dr. Jeffrey Neuschatz to explain why, due to the victim's race and the short period of time he observed the perpetrator, it was possible the victim misidentified the petitioner. The victim, however, was a credible witness. Trial counsel was able to convince the jury the petitioner did not shoot the victim, so he was convicted of lesser-included offenses.

Following the hearing, the post-conviction court denied the petition, finding the petitioner failed to carry his burden of proving either deficient performance or prejudice. When doing so, the post-conviction court relied on these findings of facts:

> I think [trial counsel's] assessment of the case was totally proper. If she had tried to put on an alibi after telling the police that he was there but he didn't do it and then all of a sudden now put on an . . . alibi witness who do not agree with each other as to where he was, things of that nature, I find that to be totally, totally incredulous why someone would do that. Put on something she knows to be false because she knew that number one, he told the police that he was there. Number two, one person said they were at one movie theater. Another person didn't remember what night it was and wasn't sure what theatre they went to. It wasn't much of an alibi.

. . .

I don't put any credence in the [petitioner's] testimony. I don't see anything that [trial counsel] did that was faulty in any way, in any respect. . . . I think if she had put on alibi, those people might have been charged with aggravated perjury, as well as [the petitioner] could be today because I don't put any – I don't believe anything he had to say.

This timely appeal followed.

### *Analysis*

On appeal, the petitioner asserts the post-conviction court erred in denying his petition for post-conviction relief, alleging the failure to call Ms. Webb and Mr. Mitchell as alibi witnesses at trial amounted to both deficient performance and was prejudicial to his case. The State contends the petitioner did not show deficient performance or prejudice because he did not present either witness or provide credible evidence that their testimonies would have changed the outcome of the case. We agree with the State.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of

correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution both require that criminal defendants receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our supreme court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35).

- 11 -

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). In order to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish that:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of [p]etitioner.

*Id.* Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a material witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified

favorably in support of his defense if called." *Id.* at 758. Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong *Strickland* test. *Id.*

Other than the petitioner's own testimony, which was contrary to the statement he gave to the police and which the post-conviction court found not to be credible, the petitioner failed to offer any proof regarding what Ms. Webb and Mr. Fleming would have said had they been called to testify at trial. Moreover, trial counsel testified that the petitioner never informed her Ms. Webb drove him to the movie theatre on the night in question, and she made a strategic decision not to call Mr. Fleming because he had been having seizures, could not remember anything, and did not want to appear at trial. This Court will not reweigh the credibility determinations of the post-conviction court, nor will it second guess the tactical and strategic decisions of trial counsel made after adequate trial preparation. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). The petitioner has failed to carry his burden of proving trial counsel's failure to call Ms. Webb or Mr. Fleming to testify at trial prejudiced the outcome of his trial and, therefore, is not entitled to post-conviction relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE