IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 3, 2018

**JERRY EDWARD LANIER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Dyer County**
**No. 11-CR-443      R. Lee Moore, Jr., Judge**

_____

**No. W2017-00920-CCA-R3-PC**

_____

The petitioner, Jerry Edward Lanier, appeals the denial of his post-conviction petition arguing he received ineffective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Noel H. Riley, Jr., Dyersburg, Tennessee, for the appellant, Jerry Edward Lanier.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Danny Goodman, Jr., District Attorney General; and Karen Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

A Dyer County jury convicted the petitioner of two counts of selling more than 0.5 grams of cocaine in a drug-free zone for which he received an effective thirty-year sentence. This Court affirmed the petitioner's convictions on direct appeal, and our Supreme Court denied his application for permission to appeal. *State v. Jerry Edward Lanier*, No. W2014-01840-CCA-R3-CD, 2015 WL 3397627, at *1 (Tenn. Crim. App. May 27, 2015), *perm. app. denied* (Tenn. Sept. 21, 2015). On direct appeal, this Court recited the following underlying facts and procedural history:

This case arises from two drug transactions that occurred within one thousand feet of Scott Street Park in Dyer County, Tennessee, between the

[petitioner] and a confidential informant working with the police. A Dyer County grand jury indicted the [petitioner] for two counts of sale of a Schedule II drug in a drug-free zone. At the [petitioner]'s trial on these charges, the parties presented the following evidence: Mike Leggett, a Dyersburg Police Department officer, testified that he was involved in a controlled buy on July 1, 2011, in Dyersburg. Sergeant Leggett stated that the drug buy occurred at a residence located on Scott Street, which is located near Scott Street Park.

Sergeant Leggett testified that, due to the "relatively small" population of Dyersburg, the narcotics unit often used confidential informants because police officers are easily recognized. He confirmed that a confidential informant was used in this controlled buy. Sergeant Leggett said that the Confidential Informant ("CI") and the CI's vehicle were searched prior to the buy. An electronic transmitter used to monitor the buy in real time as well as record the transaction was placed on the CI's body, and the CI was provided $50 for the drug purchase. The serial numbers from the bills given to the CI had been recorded by the police. Sergeant Leggett recalled that when he first met with the CI on July 1, 2011, he asked the CI, "Who can you buy from?" Using a number in his cell phone, the CI made contact with the [petitioner] and arranged to meet at the CI's residence.

Sergeant Leggett testified that police officers monitored the CI's exchange with the [petitioner] from "around the corner by the park," because the CI had informed the officers that the [petitioner] was "very suspicious and aware of his surroundings." Following the exchange, the CI and the police officers met at a predetermined location where the cocaine was collected and the CI and his vehicle were again searched.

On cross-examination, Sergeant Leggett explained that he did not determine the location of the buy. The location was selected during the phone conversation between the CI and the [petitioner]. Sergeant Leggett stated, "That's where [the CI] was instructed to meet."

Chris Clements, a Dyersburg Police Department officer, testified that he worked with Sergeant Leggett on the July 1, 2011, controlled drug buy. He stated that he searched the CI's person, clothing, and vehicle to ensure that the CI did not have any contraband before the drug buy commenced. Sergeant Clements recalled that the buy occurred on Scott Street near a public park, Scott Street Park. After the transaction, the

officers again met with the CI. Sergeant Leggett collected the drugs, and Sergeant Clements searched the CI and his vehicle, finding no evidence of contraband.

Sergeant Clements testified that he worked with the same CI on a drug buy from the [petitioner] on July 5, 2011. Sergeant Clements followed the same procedure as used for the July 1, 2011 controlled buy. He recalled that the CI called the [petitioner] and the two arranged to meet at the Scott Street residence. Immediately after the transaction, Sergeant Clements met with the CI and collected the purchased cocaine.

On cross-examination, Sergeant Clements testified that the CI was instructed to remain in his vehicle and not enter the residence during the transactions. Sergeant Clements agreed that, during the July 1, 2011, transaction, the CI did get out of his vehicle and sit on the front porch of the Scott Street residence for approximately seven minutes. He stated that the CI asked the police officers for permission before doing so.

Mason McDowell, a Dyersburg Police Department officer, testified that he worked with Sergeant Clements during the July 5, 2011, controlled drug buy involving the [petitioner]. Officer McDowell recalled that, before the controlled buy, Sergeant Clements searched the CI while he oversaw the technical equipment used to monitor and record the transaction. Officer McDowell also provided the CI with $50 of recorded money for the purchase. He stated that the CI advised the officers that he could purchase drugs from someone the CI referred to as "Slim." Officer McDowell knew "Slim" to be the [petitioner], and the CI confirmed with Officer McDowell that the person he referred to as "Slim" was the [petitioner].

The State played the video recording of the July 5, 2011 transaction, and Officer McDowell identified the CI's residence on Scott Street where the transaction occurred and the [petitioner]'s vehicle, a Ford Thunderbird, arriving in the driveway. Officer McDowell identified the [petitioner] as the person operating the Thunderbird. He also identified a white baggie being exchanged between the CI and the [petitioner] as consistent with the package the CI returned to the officers immediately following the transaction. Officer McDowell testified that U.S. currency appeared to be transferred between the men.

Officer McDowell testified that, directly after the drug buy, he met with the CI again and collected the crack cocaine that the CI had purchased

from the [petitioner] while Sergeant Clements conducted a search of the CI and the CI's vehicle.

On cross-examination Officer McDowell testified that the recorded money used during the transaction was never recovered. Officer McDowell said that, although the money was never recovered, he did provide the CI with $50, the video depicts the CI giving the [petitioner] cash, and the CI did not return with any money.

Carmen Cupples, Information Technology and Geographic Information System manager for the City of Dyersburg, identified a map her office had generated showing the distance in feet between the Scott Street residence and Scott Street Park. Ms. Cupples noted that the distance between the Scott Street residence and Scott Street Park was 165 feet. She said the distance was accurate within two to three feet.

On cross-examination, Ms. Cupples agreed that the measurement was not to the entrance of the park. Ms. Cupples stated that she did not have any information showing that the Scott Street Park "was actually adopted as a park" by the City of Dyersburg. She stated, however, that the software used to generate the map indicated that the property was owned by the City of Dyersburg.

The CI testified that he worked as a confidential informant for the Dyersburg Police Department from June 2011 to October 2011. He admitted that he had prior criminal convictions, and the most recent conviction occurred in 1999. The CI agreed that he met with police officers before each of the controlled buys from the [petitioner] on July 1 and July 5, 2011. The CI stated that the police officers provided him with money for the purchases and fitted him with audio and video transmitters to monitor and record the buys. He confirmed that he bought the cocaine from the same person, the [petitioner], on both occasions.

The CI testified that he had known the [petitioner] "all [his] life" and knew both his nickname, "Slim," and his legal name. The CI stated that he called the [petitioner] on July 1, 2011, and inquired whether the [petitioner] was selling powder cocaine. He explained to the [petitioner] that he intended to resell the cocaine to another buyer in an attempt to appear "more believable." The [petitioner] agreed to sell the CI one gram of cocaine for $50. The [petitioner] arrived at the CI's residence on Scott Street driving a Thunderbird. The CI said the transaction was quick,

approximately thirty seconds, in order to avoid detection. The CI stated that he gave the [petitioner] the $50 buy money that the police officers had given him in exchange for cocaine.

The State played the video recording of the transaction and the CI narrated as the events occurred. The CI described the transaction as a "typical" drug deal. The CI stated that, following the transaction, he drove directly to where he was to meet with the officers. Once there, he handed over the cocaine to the officers.

The CI testified that he purchased cocaine from the [petitioner] again on July 5, 2011, as part of a controlled buy. He stated that the procedures for preparing him for the buy were consistent with the procedures used on July 1. The CI said that he once again called the [petitioner] and asked to buy one gram of cocaine. The [petitioner] confirmed that he had cocaine and agreed to sell one gram to the CI. When asked how the CI knew where to meet the [petitioner] for the buy, the CI responded, "it's the same spot we usually meet at. I always meet in the same spot." The CI said that he waited almost an hour for the [petitioner] to arrive. He recalled that the [petitioner] was circling the area trying to spot any police officers before conducting the sale. This time the [petitioner]'s girlfriend was with the [petitioner] although she did not participate in the buy. The CI recalled that he handed the [petitioner] the $50 provided to him by the police, and the [petitioner] gave the CI cocaine. The CI stated that he gave Officer McDowell the cocaine that the [petitioner] had given him in exchange for the $50.

On cross-examination, the CI agreed that he had asked the [petitioner] for powder cocaine for the July 1, 2011 transaction but that the [petitioner] brought him crack cocaine. The CI said that he did not "check" to see if he received what he had requested, he merely turned it over to the officers.

Brock Sain, a Tennessee Bureau of Investigation ("TBI") forensic scientist, testified as an expert in the field of drug identification. Special Agent Sain stated that he analyzed the substance submitted from the July 1, 2011 controlled buy and concluded that the substance was 1.06 grams of crack cocaine.

Shalandus Garrett, a TBI forensic scientist, testified as an expert in the field of drug identification. Special Agent Garrett stated that she

analyzed the substance submitted from the July 5, 2011 controlled buy and the substance tested positive for cocaine and weighed .66 of a gram. She stated that both cocaine and crack cocaine are Schedule II controlled substances.

Based upon this evidence, the jury convicted the [petitioner] of two counts of sale of over .5 gram of a Schedule II controlled substance within a thousand feet of a public park.

*Jerry Edward Lanier*, 2015 WL 3397627, at *1-4.

The petitioner filed a pro se petition for post-conviction relief on September 22, 2016, alleging trial counsel's representation was constitutionally ineffective. The petitioner argued trial counsel failed to object to prosecutorial misconduct, failed to file appropriate pretrial motions, failed to communicate plea offers and advise the petitioner of the consequences of pleading guilty or going to trial, and failed to interview relevant witnesses. The post-conviction court appointed counsel on September 27, 2016, and held an evidentiary hearing on February 14, 2017.

During the post-conviction hearing, the petitioner outlined three instances of prosecutorial misconduct counsel should have objected to at trial. First, the petitioner explained, the State referred to the CI by the last name "Schaeffer" instead of his actual last name, "Roberts." The petitioner argued using this name constituted prosecutorial misconduct because "Schaeffer" was the last name of the CI's grandfather, a well-known constable in the area. Therefore, the State improperly intonated the CI was as credible as his well-liked grandfather. Second, the petitioner claimed the State improperly asked the CI leading questions during direct examination. Finally, the petitioner challenged the State's closing arguments wherein the State claimed the petitioner was "caught red-handed," despite the video failing to show an exchange of drugs. The petitioner stated trial counsel was ineffective for not objecting to each alleged infraction.

The petitioner then enumerated the pretrial motions he instructed trial counsel to file. The petitioner explained trial counsel should have moved to exclude: the video, because it had been doctored; the audio recordings of phone calls, because neither voice on the call was the petitioner's; and the money used in the controlled buy, because "there was no chain of custody." Additionally, the petitioner asserted trial counsel should have challenged the introduction of the drugs because he was arrested for the sale of powdered cocaine, but the State introduced crack cocaine at trial.

The petitioner also alleged trial counsel was deficient for failing to interview and call several witnesses who would have supported the petitioner's theory that the video

- 6 -

evidence had been doctored. The petitioner based his theory on the fact that his vehicle was present in the video despite it having been impounded at the time. These witnesses included Mr. Taylor, a neighbor of the CI, and "Michelle" from Johnson Motors, an auto dealership, both of whom could have identified the petitioner's vehicle. Additionally, the petitioner argued trial counsel should have subpoenaed Tennessee Department of Transportation records that indicated his car had been seized. The petitioner further claimed trial counsel should have interviewed members of the Drug Task Force and the CI who, the petitioner believed, fabricated evidence. The petitioner did not call these witnesses to testify at the post-conviction hearing.

Additionally, the petitioner noted trial counsel failed to strike a juror he believed was biased, though the petitioner admitted he did not include this in his petition for post-conviction relief. Finally, the petitioner conceded trial counsel conveyed all of the plea deals offered by the State.

Trial counsel then testified regarding his representation of the petitioner. Trial counsel stated he has practiced criminal law for over twenty-one years participating in several drug trials. Over the course of trial counsel's representation of the petitioner, they met about ten times. During the first meeting, they watched the video depicting the drug sale. The petitioner claimed he was not the individual shown in the video; however, trial counsel stated he did not "think any other human being on the planet other than [the petitioner] would ever believe that when they looked at the video."

Trial counsel testified he communicated every plea offer made by the State, informed the petitioner the State was seeking to enhance his sentence, and advised the petitioner that his best chance to minimize jail time was to accept the State's plea offer. However, the petitioner maintained his innocence and refused to consider any plea offers. During one particularly "contentious" meeting, trial counsel presented the petitioner with paper copies of the plea agreement and a written explanation of possible trial outcomes. According to trial counsel, the petitioner crumpled the papers and refused to discuss anything more with him. The next day, September 30, 2013, trial counsel mailed the petitioner a letter outlining his frustration with the petitioner's intransigence and attached additional copies of both aforementioned documents. The State introduced the letter into evidence during the post-conviction hearing. Trial counsel filed a motion to withdraw, but it was denied by the trial court.

Trial counsel testified the petitioner did not disclose the names of the neighbors or individuals at the auto dealership he wanted to call as witnesses at trial, because the

petitioner did not want to be a "snitch."[1]  When asked about the alleged discrepancy between whether the petitioner sold powered cocaine or crack cocaine, trial counsel recalled that one of the police records appeared to mistakenly indicate the substance recovered from the CI was powdered cocaine.  Trial counsel, however, elaborated that there was no discrepancy in the CI's testimony at trial concerning what substance was delivered.

Trial counsel's trial strategy was limited to impeaching the CI and highlighting the length of time the CI was alone in front of his apartment, implying the CI could have retrieved the drugs in question from his own house.  Trial counsel noted the petitioner did provide useful information about the CI's prior criminal drug history, which he researched and incorporated into his trial strategy.  He conceded the jury "obviously" did not find his impeachment sufficient to create reasonable doubt as to the petitioner's involvement in the crimes.

Finally, trial counsel stated he did not believe the State committed prosecutorial misconduct noting, if it had, he would have immediately objected.  Trial counsel also noted that he represented the petitioner during the motion for a new trial and on direct appeal.

In addition to finding "no proof of prosecutorial misconduct," the post-conviction court also stated:

> It's clear that [the petitioner] was advised on more than one occasion in person and in writing of the danger of proceeding with trial and [the] exposure that he faced.  It appears to the [c]ourt . . . [the petitioner] simply shut things down.  [The petitioner] didn't do anything to help [himself].  That's been actually the procedure that [he has] [followed] throughout [these] proceedings.  I think under the circumstances under the facts of the case that we have, [trial counsel] did everything he could to defend [him].  [The petitioner] did nothing to try to help [trial counsel] defend [him].  It may have been an impossible task with the information that they had on the video and the audios.  The [c]ourt does not feel that there's any defective performance by counsel and that there is no evidence of any prejudice even if there was.  So [the petitioner's] motion is denied.  [The petitioner's] petition is denied.

---

[1] Trial counsel further elaborated that the petitioner appeared to be operating under the belief that the district attorney and trial counsel were in collusion.  Trial counsel testified he attempted to disabuse petitioner of this impression both orally and in the September 30th letter.

This timely appeal followed.

*Analysis*

On appeal, the petitioner challenges trial counsel's representation on two grounds. First, the petitioner argues trial counsel did not adequately prepare for trial because he did not investigate potential witnesses in support of his defense. Secondly, the petitioner asserts trial counsel failed to object to prosecutorial misconduct throughout the trial. The State argues trial counsel prepared as well as possible given the petitioner's intransigence, and contends the State did not engage in prosecutorial misconduct. Based on our review of the record and relevant authorities, we agree with the State.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999); *Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden

to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our Supreme Court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35). When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing

*Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). In order to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). Additionally, the petitioner must provide any witnesses that would have likely affected the outcome of the trial. *Taylor v. State*, 443 S.W.3d 80, 84-85 (Tenn. 2014). "[I]t is axiomatic that '[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.'" *Taylor*, 443 S.W.3d at 84-85; *see also Cauthern*, 145 S.W.3d at 616.

Here, the petitioner alleges trial counsel failed to call several witnesses at trial to aid in his defense. Specifically the petitioner claims trial counsel should have called the CI's neighbor, an individual from an auto dealership, officers on the Drug Task force, and should have subpoenaed certain records from the Tennessee Department of Transportation. However, the petitioner failed to present any of these witnesses or the records during the post-conviction hearing. *Taylor*, 443 S.W.3d at 84-85. Additionally, trial counsel's testimony regarding petitioner's refusal to be a "snitch" and counsel's letter to the petitioner both support the post-conviction court's conclusion that the petitioner refused to disclose these witnesses and he "simply shut things down." Despite not explicitly doing so, the post-conviction court accredited trial counsel's testimony indicating the petitioner stood in the way of his own defense. *See Donald L. Seiber v. State*, No. E2010-00285-CCA-R3-PC, 2011 WL 1484173, at *5 (Tenn. Crim. App. Apr. 19, 2011) (determining that, despite not explicitly accrediting trial counsel's testimony, it was "implicit" in the post-conviction court's finding they had done so). Therefore, petitioner has failed to meet his burden of proof as it relates to trial counsel's alleged failure to call witnesses at trial, and the record supports the post-conviction court's determination that trial counsel provided effective representation. *Taylor*, 443 S.W.3d at 84-85. The petitioner is not entitled to relief on this issue.

The petitioner next argues trial counsel failed to object to prosecutorial misconduct throughout the trial. Specifically, the petitioner highlights the State referring

to the CI by his grandfather's last name in order to bolster the CI's credibility.[2]  We disagree that this action constituted prosecutorial misconduct.  First, the petitioner produced no evidence the State's actions were improperly motivated.  Second, even if the State's use of the CI's grandfather's last name somehow bolstered the CI's credibility, trial counsel introduced evidence of the CI's prior criminal convictions, in accordance with the petitioner's instructions.  *See Jerry Edward Lanier*, 2015 WL 3397627, at *6 ("The [petitioner] thoroughly cross-examined the CI at trial and the jury heard about the CI's criminal history . . . .  The jury . . . found the CI's account of the transactions more credible than the [petitioner's] theory of the case.").  Trial counsel additionally stated, in his professional experience, nothing in the State's case constituted prosecutorial misconduct.  Absent testimony from trial counsel or evidence indicating his decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel."  *Gregory Robinson v. State*, No. W2011-00967-CCA-R3-PD, 2013 WL 1149761, at *79 (Tenn. Crim. App. Mar. 20, 2013) quoting (*State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan.12, 2007), *perm. app. denied* (Tenn. May 14, 2007)).  Moreover, the post-conviction court found "no proof of prosecutorial misconduct during the trial."  Based on our review of the record, the petitioner failed to provide evidence that would preponderate against the post-conviction court's determination.

Furthermore, in light of the overwhelming evidence presented at trial, there is nothing to support the inference that, had trial counsel objected, it would have affected the trial's outcome.  *See Curtis Cecil Wayne Bolton v. State*, No. E2014-00559-CCA-R3-PC, 2015 WL 4557754, at *18 (Tenn. Crim. App. July 29, 2015) (determining, as the petitioner failed to establish any prejudice from trial counsel's failure to object to closing statements, he was not entitled to post-conviction relief).  The State provided video evidence and testimony from the CI that the petitioner engaged in the sale of crack cocaine.  As the petitioner has failed to provide evidence establishing prejudice or deficient representation, he is not entitled to relief.

---

[2] We note the petitioner only raises this single incident in his briefing despite testifying to other alleged instances of misconduct at the post-conviction hearing.  Therefore, we only address trial counsel's failure to object to the State using a different last name for the CI and deem the other grounds waived.

*Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE